WHITACRE PARTNERSHIP, AN ILLINOIS LIMITED PARTNERSHIP v. BIOSIGNIA, INC., COR-
PORATE SUCCESSOR TO BIOMAR INTERNATIONAL, INC. AND FUTURE HEALTH TECHNOLOGIES
COMPANY; T. NELSON CAMPBELL; AND T. COLIN CAMPBELL

No. 617PA02

(Filed 6 February 2004)

**1. Estoppel— judicial—recognized**

The doctrine of judicial estoppel is part of the common law
of North Carolina. This recognition of the doctrine is a natural
step in the evolution of North Carolina jurisprudence, consistent
with settled precedent, and not a point of departure.

**2. Collateral Estoppel and Res Judicata— doctrines distinguished**

Res judicata estops a party or its privy from bringing a sub-
sequent action based on the same claim, while collateral estop-
pel precludes the subsequent adjudication of a previously deter-
mined issue, even if the subsequent action is based on a different
claim.

**3. Estoppel— judicial—distinguished from collateral estoppel**

Judicial estoppel and collateral estoppel are closely related,
but differ in that judicial estoppel protects the integrity of the
judicial process rather than the parties. Judicial estoppel does
not require that an issue have been litigated in the prior pro-
ceeding and does not require mutuality of the parties.

1

**4. Estoppel— equitable—detrimental reliance**

Under equitable estoppel, a party whose words or conduct induce another's detrimental reliance may be estopped to deny the truth of his earlier representations.

**5. Estoppel— judicial—distinguished from equitable estoppel**

Judicial estoppel and equitable estoppel may be distinguished in that judicial estoppel does not require mutuality of parties, does not require detrimental reliance, and protects the integrity of judicial proceedings rather than fairness between parties.

**6. Estoppel— quasi—defined**

Quasi-estoppel prohibits a party who has accepted a transaction and its benefits from taking a later, inconsistent position.

**7. Estoppel— judicial—distinguished from quasi-estoppel**

Judicial estoppel, unlike quasi-estoppel, does not require mutuality of parties. Neither requires detrimental reliance.

**8. Damages and Remedies— election of—defined**

Election of remedies compels that a choice must be made between remedies that proceed upon opposite and irreconcilable claims of right.

**9. Estoppel— judicial—distinguished from election of remedies**

Judicial estoppel and election of remedies overlap, but not perfectly. Judicial estoppel exists to protect the integrity of the judicial process rather than the redress of a single wrong, and it is based upon an inconsistency of position rather than a selection of means of enforcing a right.

**10. Estoppel— judicial—theory without label**

North Carolina courts have estopped parties from asserting inconsistent positions in the same or subsequent judicial proceedings without specifying the precise legal theory at work.

**11. Estoppel— judicial—reasoning behind N.C. doctrine**

The North Carolina Supreme Court follows the reasoning of the United States Supreme Court in *New Hampshire v. Maine*, 532 U.S. 742, in recognizing the rule of judicial estoppel.

**12. Estoppel— judicial—factors—flexible**

The doctrine of judicial estoppel is applied in North Carolina with a weighing of discretionary factors rather than a rote application of inflexible prerequisites. The only essential factor is that the party's subsequent position must be clearly inconsistent with its earlier position. Courts also look at whether the earlier court accepted the earlier position and whether the party asserting the inconsistent position would derive an unfair advantage. It may be appropriate to resist application of judicial estoppel when the prior position was based on inadvertence or mistake.

**13. Estoppel— judicial—criminal proceedings—no application**

Judicial estoppel should not ordinarily be applied against defendants or the government in a criminal proceeding.

**14. Estoppel— judicial—inconsistent legal theories—no application**

Judicial estoppel is limited to inconsistent factual assertions and should not be applied to prevent the assertion of inconsistent legal theories.

**15. Estoppel— judicial—intent to deceive—not required—permitted as a factor**

A court applying judicial estoppel is not required to specifically determine that the party to be estopped intended to mislead the court. While intent to deceive would weigh heavily in favor of invoking the doctrine, courts should carefully balance the equities and it is possible that a reasonable justification for a change in position may militate against its application.

**16. Estoppel— judicial—privity of parties—not required**

A rigid judicial estoppel rule requiring the party to be estopped to be identical with the party in the earlier proceeding would necessarily diminish the protective function of the doctrine of judicial estoppel. So long as the party to be judicially estopped is a privy of the party who made the prior inconsistent statement before a tribunal, due process is not offended.

**17. Estoppel— judicial—privity of partners and partnership—not determined**

Whether general partners were in privity with the partnership for judicial estoppel purposes was for the trial court to determine on remand where the Supreme Court could not discern whether the trial court had made the privity determination.

**18. Estoppel— judicial—version of doctrine used by trial court—undeterminable—remand**

A judicial estoppel case was remanded because the Supreme Court could not determine the formulation of judicial estoppel used by the trial court, and because the Supreme Court articulated a different version of the doctrine.

**19. Estoppel— judicial—review—abuse of discretion standard**

A trial court's application of judicial estoppel is reviewed for abuse of discretion.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 153 N.C. App. 608, 574 S.E.2d 475 (2002), reversing and remanding an order for summary judgment entered 13 July 2001 by Judge David Q. LaBarre in Superior Court, Orange County. Heard in the Supreme Court 8 September 2003.

*Farmer & Watlington, L.L.P., by R. Lee Farmer; and Bill T. Walker, pro hac vice, for plaintiff-appellee.*

*Parker, Poe, Adams & Bernstein, L.L.P., by Robert W. Spearman; and Steptoe & Johnson, L.L.P., by J. William Koegel, Jr., pro hac vice, for defendant-appellants.*

MARTIN, Justice.

Plaintiff Whitacre Partnership, an Illinois limited partnership (plaintiff or Whitacre Partnership), seeks a declaration establishing its ownership of 1,000,000 shares of common stock in defendant Biosignia, Inc. (defendant or Biosignia). In the alternative, plaintiff seeks damages for the wrongful conversion of the stock. On 28 June 2001, defendants moved for summary judgment on the ground that the doctrine of judicial estoppel precluded plaintiff from asserting a factual position contrary to earlier representations made by plaintiff's general partners before a bankruptcy tribunal. The trial court concluded there was no genuine issue of material fact and granted defendant's motion for summary judgment. The Court of Appeals determined that judicial estoppel did not apply on the facts of the present case and remanded to the trial court. We modify and affirm.

## I.

The facts of the instant case may be summarized as follows. Whitacre Partnership is an Illinois limited partnership. Its general

partners are Mark E. Whitacre and Ginger L. Whitacre (collectively "the Whitacres"), and its limited partners are the Whitacres' three children, Alexander R. Whitacre, William A. Whitacre, and Tanya M. Whitacre (collectively "the Whitacre children"). The Whitacres, as general partners, each hold a one percent interest in the family partnership. The Whitacre children collectively own a ninety-eight percent interest as limited partners. According to the deposition testimony of Mark E. Whitacre (Whitacre), "[t]he Whitacre Partnership was meant to be a trust fund" for the benefit of the Whitacre children. At all times since the partnership was formed, its sole asset has been whatever right or title it may have had in the stock at issue in the present case.

Biosignia is a closely held Delaware biotech corporation registered as a foreign corporation doing business in North Carolina. Its principal place of business is Orange County, North Carolina. Biosignia's corporate predecessors include Advocacy Communications, Inc. (Advocacy), also known by its trade name, Future Health Technologies, Inc. (FHT),[1] and Biomar International, Inc. (Biomar). Defendants T. Nelson Campbell and T. Colin Campbell (the Campbell defendants) are officers and directors of Biosignia and its predecessor companies.

On 1 October 1995, Whitacre was appointed director, President, and Chief Executive Officer of FHT, and Advocacy issued 250 shares of common stock to Whitacre in his name. The employment agreement reached between Whitacre and FHT on or prior to 1 October 1995 was memorialized in a letter dated 12 October 1995 and signed by both Whitacre and defendant T. Colin Campbell. The letter provided that Whitacre would receive, in addition to his salary, "20% of the outstanding shares of FHT by the date of FHT's first private placement," conditioned on Whitacre's contribution of $150,000 to FHT and his "not [having] voluntarily retired from [his] position of CEO or

---

1. The Court of Appeals concluded that a genuine issue of material fact existed as to whether FHT was a "predecessor corporation to Advocacy" and stated that "[n]othing in the corporate documents in the record reflects FHT's relationship, if any, to Advocacy, Biomar, Biosignia, or Clintech." We disagree. The record is unequivocal on the question of Biosignia's corporate lineage. Plaintiff's own complaint specifically alleges that Biosignia is a "corporate successor" to FHT. Biosignia, in its answer, admits this factual allegation. In an affidavit attached to its summary judgment motion, Biosignia outlined its corporate history, explaining that FHT was "also known as" Advocacy and that Advocacy and Biomar were corporate predecessors of Biosignia. At no point has plaintiff denied any of this history. Finally, Whitacre expressly acknowledged in his deposition testimony that "Future Health Technologies, Biomar, and Biosignia all are one."

otherwise terminated [his] continuing relationship to FHT" as of the date of the first private placement. By the terms of the letter, the shares would be issued to Whitacre "and/or any trust established on behalf of [his] children." On 1 January 1996, Whitacre transferred his 250 shares in Advocacy to Whitacre Partnership.

On 26 April 1996, Advocacy's Board of Directors and shareholders executed a "Unanimous Written Consent in Lieu of a Joint Special Meeting" (Unanimous Written Consent). Whitacre signed as a director and on behalf of Whitacre Partnership as a shareholder of Advocacy. The Campbell defendants signed as directors and individually as shareholders. The Unanimous Written Consent (1) ratified Advocacy's hiring of Whitacre as President and CEO of the corporation and the issuance of 250 shares of Advocacy stock to Whitacre; (2) acknowledged that the value of those shares as of 1 October 1995 was $150,000, and that they "represent[ed] 20% of total ownership" of Advocacy and were issued for reimbursable expenses incurred on behalf of the corporation and as compensation for Whitacre's services; and (3) authorized a share exchange for officers and counsel of the corporation at a rate of 8,000 "New Shares" for each "Old Share."

On 29 April 1996, Advocacy filed a certificate of amendment with the Delaware Secretary of State to change its corporate name to "Biomar, International, Inc." The following day Biomar issued stock certificate number 8 to Whitacre Partnership for 2,000,000 shares. No restrictive legend or other limiting indication appears on the face of the stock certificate. In a letter enclosing the certificate dated 25 September 1996, counsel for Biomar informed Whitacre that the new certificate "replace[d] the stock certificate of the original corporation, Advocacy Communications, Inc." and that the "original of those certificates were marked cancelled and placed in the corporate book of Advocacy Communications, Inc."[2]

In early 1997, a federal grand jury indicted Whitacre on forty-five counts of tax fraud, wire fraud, money laundering, conspiracy, and other charges in connection with Whitacre's embezzlement of several million dollars from his former employer, Archer-Daniels-Midland (ADM). Pursuant to a plea agreement, Whitacre pled guilty in October 1997 to thirty-seven counts of wire fraud, interstate transportation of stolen property, conspiracy to defraud, money laun-

---

2. We note that the issuance of 2,000,000 shares to "replace[]" the original 250 shares issued by Advocacy is consistent with the share exchange ratio of 8,000 to 1 referred to in the Unanimous Written Consent.

dering, and filing false tax returns in the United States District Court for the Central District of Illinois. On 4 March 1998, Whitacre was ordered to serve an active sentence of 108 months in a federal correctional facility and to pay over $11,000,000 in restitution. Shortly thereafter, in a separate federal proceeding, Whitacre was sentenced to an active term of thirty months for his participation in a price-fixing scheme during his tenure at ADM. In at least the former of the two criminal proceedings, as well as a bankruptcy proceeding initiated in September 1997, Whitacre was represented by Attorneys Bill T. Walker and Richard F. Kurth.

In January or February of 1997, upon Whitacre's request, Biomar reissued 250,000 of the 2,000,000 shares held by Whitacre Partnership in the names of Whitacre's attorneys, Walker and Kurth. Certificate number 18 was issued to Bill T. Walker and his spouse Susan P. Walker as joint tenants with a right of survivorship in the amount of 100,000 shares. Certificate number 19 was issued to Richard Kurth and his spouse Diane Kurth for 150,000 shares. Both certificates were issued sometime in 1997 and backdated to 3 September 1996, and both are listed in Biomar's stock ledger as "transfer[s]" from Whitacre Partnership. The record also reveals that a third stock certificate—certificate number 17, issued to Whitacre Partnership in the amount of 1,750,000 shares—was also dated 3 September 1996. The record is silent as to whether this certificate was also backdated, and the stock ledger entry describes certificate number 17 as a new issue for "shares retained" after a transfer of 250,000 shares. Taken together, certificates 17, 18, and 19 are consistent with T. Nelson Campbell and Whitacre's contentions that Whitacre Partnership transferred 250,000 of its 2,000,000 shares in Biosignia to compensate Whitacre's attorneys. Cumulatively, they reflect a 250,000-share reduction in Whitacre Partnership's holding in Biosignia, an amount equivalent to the number of shares transferred to Whitacre's attorneys as compensation for their services. All three certificates were signed by T. Nelson Campbell as Secretary/Treasurer of Biomar and by Mark E. Whitacre as President of Biomar.

On 11 February 1997, following his indictment by a federal grand jury and a brief period of hospitalization for what he characterized as "suicidal thoughts and erratic behavior," Whitacre resigned as President and Chief Executive Officer of Biomar. In connection with his resignation, Whitacre accepted a position as an officer of Clintech, a new subsidiary of Biomar. In his letter of resignation to T. Nelson Campbell, Whitacre referred to a "previous understanding"

between Campbell and Whitacre whereby Whitacre's resignation would "result in the forfeiture of 500,000 unearned shares of Biomar's common stock." The letter also expressed Whitacre's understanding "that a new certificate will be issued in the amount of 1,250,000 shares," and stated that a "copy of [Whitacre's original] stock certificate" was attached. The letter requested that the new certificate be "issued to [Whitacre's] children" in the name of W.F.P. Management Company (WFP), which Whitacre described as "the company holding my children's estate (via a Family Limited Partnership)." W.F.P. Management, it appears, is simply another name for the Whitacre Family Partnership.

In a letter accepting Whitacre's resignation dated 20 February 1997, T. Colin Campbell invited Whitacre's approval to an expression of the "agreement between [Whitacre] and Biomar concerning [Whitacre's] resignation." The letter stated that "the total number of shares owned by [Whitacre's] family partnership (prior to any share distributions to [Whitacre's] attorneys) is 1,250,000 shares" and requested Whitacre to "indicate [his] approval by signing below." Whitacre did sign the letter, just below Campbell's signature, under the caption "AGREED TO." The date "20 February 1997" also appears on the face of two separate stock certificates issued by Biomar to Whitacre Partnership. Stock certificate number 21, signed by T. Nelson Campbell as Secretary and T. Colin Campbell as President, was issued in the name of "W.F.P. Management Co., Inc." in the amount of 1,000,000 shares. The ledger entry for certificate number 21 indicates that its issuance coincided with the purported surrender of 750,000 shares from certificate number 17, which was originally issued in the amount of 1,750,000 shares in the name of Whitacre Partnership. It is listed as a transfer from "Whitaker [sic] Partnership." Stock certificate number 27, also signed by the Campbell defendants, was issued in the name of "Whitacre Partnership, a family partnership" in the amount of 1,000,000 shares. The stock ledger indicates that this was a transfer from WFP. In his 10 May 2001 deposition, Whitacre acknowledged that the date on certificate 21 was written in his own handwriting, and that the certificate "resulted from the discussions that [T. Nelson Campbell] and I had at my termination of employment with Biomar in February '97." Whitacre also acknowledged that he had signed a "contract" on 20 February 1997, under the terms of which he was to "forfeit 750,000 of those shares out of the 2,000,000."[3]

---

3. We note that there is a discrepancy in Whitacre's representations as to how many shares he agreed to forfeit. While his resignation letter refers to the forfeiture of

In early 1997, Whitacre and T. Nelson Campbell executed a Restricted Stock Agreement (RSA), the scope and effect of which is crucial to a determination of the ownership of the stock at issue here. Although the agreement is dated 23 October 1995, the parties agree that the RSA was backdated to be given retroactive effect, and was not actually executed on 23 October 1995. The record is unclear, however, as to the actual date of execution.

The RSA purports to be a fully integrated agreement between Whitacre and T. Nelson Campbell, as an officer of FHT "or any other future name" of FHT, concerning the 2,000,000 shares issued to Whitacre. By its terms, the agreement is binding on the "parties . . . themselves, their successors and their assigns." The RSA states that the company "hereby provides [Whitacre] 2,000,000 shares of its common stock . . . upon [Whitacre's] joining the company . . . and for his continued employment as an officer of the Company or one of its subsidiaries/or joint ventures subject to the options and restrictions as specified below." After expressing the parties' desire to "restrict[] the sale, disposition, or other transfer" of Whitacre's shares, it defines "Restricted Shares" to include "all outstanding Provided Shares" and defines "Provided Shares" as "the 2,000,000 Shares provided to [Whitacre] upon joining the Company . . . and for his continued employment as an officer of the Company or one of its subsidiaries/or joint ventures for a period of five years in order to be fully vested."

On 4 March 1997, thirteen days after Biomar had accepted Whitacre's resignation from FHT, T. Nelson Campbell and Whitacre executed an addendum to the 23 October 1995 RSA. In its entirety, the addendum provides as follows:

On March 4, 1997 this agreement was reached among the Principals of Biomar International, Inc. that Dr. Mark E. Whitacre would become the CEO/President of a subsidiary of Biomar to establish a joint venture company that will provide biostatistical services to pharmaceutical companies and HMOs. In this position, 1.25 million shares of stock (including the shares used to pay attorneys) will be maintained in the Whitacre Limited Partnership. 50% of the 1.25 million shares will be

500,000 shares, Whitacre's deposition testimony corroborates Biosignia's stock ledger and reflects a forfeiture of 750,000 shares. The latter figure is more consistent with plaintiff's assertion that it owns 1,000,000, not 1,250,000, shares of Biosignia stock. Plaintiff's original 2,000,000 share holding, less 250,000 shares to pay Whitacre's attorneys and a forfeiture of 750,000 shares, leaves 1,000,000 shares remaining.

vested in 1.5 years from the above date (3/4/97), and 100% within four years.

Defendants claim that this addendum to the vesting schedule originally laid out in the October 1995 RSA controls the disposition of this case.

On 11 September 1997, the Whitacres filed a voluntary petition for discharge of their debts under Chapter 7 of the United States Bankruptcy Code. In the course of their bankruptcy filings and statements before the bankruptcy trustee, the Whitacres made the following factual representations, which defendant maintains plaintiff is now estopped to contradict.

First, on the statutorily mandated "Schedule B" disclosure of their personal property, the Whitacres appeared to acknowledge that the stock in question was subject to the 23 October 1995 RSA. Under the heading "Stock and interest in incorporated and unincorporated businesses," the Whitacres listed "1.25 million shares of Biomar Stock maintained in Whitacre Limited Partnership conditioned on October 23, 1995 restricted stock agreement." There is no corresponding entry for this stock in the "value" column. In the subsequent paragraph, titled "Interest in partnerships or joint ventures," the Whitacres stated, "Debtors are general partners in Whitacre Limited Partnership with right to receive 1% each for administration. Management Company known as W.P. Management Company. Currently not funded." The market value of this asset is listed as "UNKNOWN."

Second, during the statutorily mandated "341 Meeting"[4] between debtors, creditors, and the bankruptcy trustee, Whitacre made additional statements, under oath, that appeared to acknowledge that the stock was subject to the 4 March 1997 Addendum to the RSA and that, given Whitacre's resignation from the company, it could never vest in interest. The relevant portion of the transcript from that meeting reads as follows:

> Mr. Yaeger [bankruptcy trustee]: You had a restricted stock agreement—and have provided me a copy of that—related to your employment as a chief executive officer where you were to receive 1.25 million shares of BioMar?

---

4. Under section 341 of the Bankruptcy Code, the bankruptcy trustee must convene and preside over a meeting between the debtor, his or her creditors, and any equity security holders. During this meeting, the trustee must orally examine the debtor concerning the effects of a discharge in bankruptcy, the debtor's ability to file a petition under a different chapter, and other matters. 11 U.S.C. § 341 (2000). The debtor must testify under oath at this examination. 11 U.S.C. § 343 (2000).

Dr. Whitacre: Right.

Mr. Yaeger: What's the status of that? Is that an asset your creditors can look to?

Dr. Whitacre: It's an asset I won't have because of a vesting schedule that is required—two and a half years to receive fifty percent of that, which would have been spring of next year, and five years to receive a hundred percent of that on a vesting schedule, so I will not receive that at this point.

Mr. Craven [counsel for Whitacre]: As a result of resigning 1, October.

Dr. Whitacre: Right. Resigning—the October 1 resignation.

Mr. Yaeger: Does that stock have any present value?

Dr. Whitacre: It does not.

. . . .

Mr. Yaeger: Are you owed anything by BioMar as a result of your employment or other contributions?

Dr. Whitacre: No, I received my last paycheck, and that's it.

Eventually, the Whitacres' bankruptcy petition was voluntarily dismissed.[5]

Whitacre resigned from Clintech in October 1997, permanently ending his professional relationship with Biosignia, its predecessors, and its subsidiaries. Handwritten entries in the "transfer" columns of the stock ledger dated 1 October 1997 describe certificates 18, 19, and 27—issued to Attorney Bill Walker, Attorney Richard Kurth, and Whitacre Partnership, respectively—as "VOID: Reverted to Biosignia, Inc."

On 8 May 2000, Whitacre Partnership instituted the instant civil action against Biosignia, alleging wrongful cancellation of and, in the alternative, conversion of, 1,000,000 shares of stock, and seeking damages in excess of twenty million dollars. On 28 June 2001, after the close of discovery, Biosignia filed a motion for summary judgment, arguing that Whitacre Partnership was judicially estopped

5. Under the Bankruptcy Code, a voluntary dismissal is not at the debtor's discretion. Upon motion by the debtor, the bankruptcy trustee may order dismissal only "for cause" following notice to creditors and a hearing. 11 U.S.C. § 707(a) (2000); 11 U.S.C. app., R. Bankr. P. 1017(a) (2000).

to deny the earlier assertions of its general partners before a bankruptcy tribunal that the stock was subject to the RSA and its Addendum and, by the terms of those agreements, could never vest in plaintiff. On 13 July 2001, the trial court granted defendants' motion for summary judgment. On 5 November 2002, the Court of Appeals reversed the trial court and remanded for adjudication on the merits. On 27 February 2003, this Court allowed discretionary review.

## II.

[1] The dispositive issue before this Court is whether the doctrine of judicial estoppel bars Whitacre Partnership from asserting ownership of the stock in question based on the Whitacres' earlier representations before a bankruptcy tribunal. This case thus requires us to determine whether the doctrine of judicial estoppel is a part of the common law of North Carolina. We hold that it is, and hereby join at least thirty-five other states and the United States Supreme Court in recognizing the doctrine. *See New Hampshire v. Maine*, 532 U.S. 742, 749, 149 L. Ed. 2d 968, 977 (2001); *Hayne Fed. Credit Union v. Bailey*, 327 S.C. 242, 251-52, 489 S.E.2d 472, 477 (1997); *Fay v. Fed. Nat'l Mortgage Ass'n*, 419 Mass. 782, 787-88, 647 N.E.2d 422, 426 (1995); Douglas W. Henkin, Comment, *Judicial Estoppel— Beating Shields into Swords and Back Again*, 139 U. Pa. L. Rev. 1711, 1756-60 (1991) (appendix listing thirty-three states as having accepted judicial estoppel).

Before we describe the contours of the doctrine, we pause to consider the evolution of judicial estoppel, tracing its roots in the legal landscape of this Court and the United States Supreme Court. As this discussion will show, our recognition of judicial estoppel is not a point of departure, but a natural step in the evolution of our jurisprudence, consistent with well-established legal principles and settled precedent. Although we have not previously considered whether judicial estoppel is a viable doctrine in North Carolina, we have long applied several of its companion estoppel doctrines and have consistently recognized the importance of protecting the integrity of the judicial process from the vagaries of litigants who may seek to manipulate it. *See, e.g., Kannan v. Assad*, 182 N.C. 77, 78, 108 S.E. 383, 384 (1921) ("It is well understood that, except in proper instances, a party to a suit should not be allowed to change his position with respect to a material matter, during the course of litigation, nor should he be allowed to 'blow hot and cold in the same breath.' " (citations omitted)). In addition, although the Court of Appeals has

recognized the doctrine, it has struggled with its precise formulation. *See, e.g., Medicare Rentals, Inc. v. Advanced Servs.*, 119 N.C. App. 767, 769-71, 460 S.E.2d 361, 363-64 (1995) (defining judicial estoppel); *State v. Taylor*, 128 N.C. App. 394, 400, 496 S.E.2d 811, 815 (1998) (using the term "judicial estoppel" interchangeably with "equitable estoppel"), *disc. rev. denied*, 348 N.C. 76, 505 S.E.2d 884 (1998), *appeal dismissed in part*, 348 N.C. 76, 505 S.E.2d 884 (1998), *aff'd*, 349 N.C. 219, 504 S.E.2d 785 (1998). Our discussion of the historical roots of judicial estoppel seeks to avoid further confusion by carefully situating judicial estoppel in the broader analytical framework of estoppel and preclusion doctrines.

Broadly speaking, "estoppel is a bar which precludes a person from denying or asserting anything to the contrary of that which has, in contemplation of law, been established as the truth." 28 Am. Jur. 2d *Estoppel and Waiver* § 1 (2000). As we noted over 150 years ago, it is a principle which "lies at the foundation of all fair dealing between [persons], and without which, it would be impossible to administer law as a system." *Armfield v. Moore*, 44 N.C. 157, 161 (1852). "Estoppel" is not a single coherent doctrine, but a complex body of interrelated rules, including estoppel by record, estoppel by deed, collateral estoppel, equitable estoppel, promissory estoppel, and judicial estoppel. 28 Am. Jur. 2d *Estoppel and Waiver* § 2 (2000). Viewed in its proper theoretical context, judicial estoppel is best understood as a specific branch of a broader spectrum of estoppel and preclusion doctrines customarily used to promote the fairness and integrity of judicial proceedings.

While estoppel in its broadest sense predates the American colonial experience, *see Armfield*, 44 N.C. at 161, legal scholars generally agree that the concept of judicial estoppel was first applied in *Hamilton v. Zimmerman*, 37 Tenn. 39 (1857). *See* William Houston Brown, *Debtor's Counsel Beware: Use of the Doctrine of Judicial Estoppel in Nonbankruptcy Forums*, 75 Am. Bankr. L.J. 197, 200 (2001) [hereinafter Brown]. Describing the doctrine as a device to protect the sanctity of the oath, the Tennessee Supreme Court applied judicial estoppel on an absolute basis, holding that a factual assertion in a judicial proceeding estopped any contradictory factual assertion by the same party in a later proceeding, except where the original representation was made "inconsiderately or by mistake." *Hamilton*, 37 Tenn. at 48. Although the Tennessee courts continue to apply this narrow version of the doctrine, most modern authorities agree that the purpose of judicial estoppel is to " 'protect

the integrity of the judicial process,' " *New Hampshire*, 532 U.S. at 749, 149 L. Ed. 2d at 977 (quoting *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982)), not just the sanctity of the oath, and that "a hallmark of the doctrine is its flexible application." *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 59, 81 L. Ed. 2d 42, 51 (1984) (discussing estoppel generally); *see also* 18 James Wm. Moore et al., Moore's Federal Practice § 134.31, at 134-71 (3d ed. 1997).

Scholars have noted that the doctrine "has its roots in nineteenth century American law," a period when preclusion law formed an "inconsistent patchwork," and the phrase "judicial estoppel" was often used to refer to the emerging doctrines of res judicata and collateral estoppel. Lawrence B. Solum, *Caution! Estoppel Ahead: Cleveland v. Policy Management Systems Corporation*, 32 Loy. L.A. L. Rev. 461, 475-76, 483 (1999) [hereinafter Solum]. By the early part of the twentieth century, the phrase was used loosely to refer to a variety of legal doctrines, including res judicata, collateral estoppel, equitable estoppel, quasi-estoppel, and election of remedies. *See, e.g., Aycock v. O'Brien*, 28 F.2d 817, 819 (9th Cir. 1928) (using the phrase "judicial estoppel" to refer to collateral estoppel); *Van Norden v. Charles R. McCormick Lumber Co.*, 27 F.2d 881, 881 (9th Cir. 1928) (using "judicial estoppel" to refer to res judicata or claim preclusion); *Parkerson v. Borst*, 264 F. 761, 766-67 (5th Cir. 1920) (using "judicial estoppel" to refer to an election of remedies doctrine); *United States Fid. & Guar. Co. v. Porter*, 3 F.2d 57, 59 (D. Idaho 1924) (using "judicial estoppel" to refer to res judicata and collateral estoppel). Although these doctrines are technically distinguishable from judicial estoppel, they reflect a shared and longstanding judicial reluctance to permit the assertion of inconsistent positions before a judicial or administrative tribunal. *See* Eugene R. Anderson & Nadia V. Holober, *Preventing Inconsistencies in Litigation with a Spotlight on Insurance Coverage Litigation: The Doctrines of Judicial Estoppel, Equitable Estoppel, Quasi-Estoppel, Collateral Estoppel, "Mend the Hold," "Fraud on the Court" and Judicial and Evidentiary Admissions*, 4 Conn. Ins. L.J. 589, 591-97 (1998) [hereinafter Anderson & Holober]. It is therefore useful to consider judicial estoppel in connection with these related doctrines.

North Carolina courts have recognized many of the doctrinal precursors of judicial estoppel in an evolving jurisprudence that has consistently disfavored reversals of position on factual matters to suit the exigencies of the moment. Our recognition of judicial estoppel is a natural extension of these doctrines, one which paral-

lels the development of a line of cases from the United States Supreme Court that culminated in *New Hampshire v. Maine*, 532 U.S. 742, 149 L. Ed. 2d 968.

We begin our survey of the historical roots of judicial estoppel with a discussion of res judicata and collateral estoppel. North Carolina recognizes both doctrines as traditionally formulated, although we have followed the modern trend in abandoning the strict "mutuality of estoppel" requirement for defensive uses of collateral estoppel. *Thomas M. McInnis & Assocs. v. Hall*, 318 N.C. 421, 434, 349 S.E.2d 552, 560 (1986). Recognizing the close relationship between the two doctrines, we have sometimes referred to both res judicata and collateral estoppel as species of a broader category of "estoppel by judgment." *See, e.g., Bockweg v. Anderson*, 333 N.C. 486, 491-92, 428 S.E.2d 157, 161 (1993). More often, however, we have used the term "estoppel by judgment" to refer specifically to collateral estoppel. *See, e.g., State v. Summers*, 351 N.C. 620, 622, 528 S.E.2d 17, 20 (2000); *State v. Brooks*, 337 N.C. 132, 147, 446 S.E.2d 579, 589 (1994) (referring to "collateral estoppel by judgment").

[2] Under the doctrine of res judicata or "claim preclusion," a final judgment on the merits in one action precludes a second suit based on the same cause of action between the same parties or their privies. *State ex rel. Tucker v. Frinzi*, 344 N.C. 411, 413, 474 S.E.2d 127, 128 (1996); *Hales v. North Carolina Ins. Guar. Ass'n*, 337 N.C. 329, 333, 445 S.E.2d 590, 594 (1994). The doctrine prevents the relitigation of "all matters . . . that were or should have been adjudicated in the prior action." *McInnis*, 318 N.C. at 428, 349 S.E.2d at 556. Under the companion doctrine of collateral estoppel, also known as "estoppel by judgment" or "issue preclusion," the determination of an issue in a prior judicial or administrative proceeding precludes the relitigation of that issue in a later action, provided the party against whom the estoppel is asserted enjoyed a full and fair opportunity to litigate that issue in the earlier proceeding. *McInnis*, 318 N.C. at 433-34, 349 S.E.2d at 560; *Bradley v. Hidden Valley Transp., Inc.*, 148 N.C. App. 163, 166, 557 S.E.2d 610, 613 (2001), *aff'd per curiam*, 355 N.C. 485, 562 S.E.2d 422 (2002). Whereas res judicata estops a party or its privy from bringing a subsequent action based on the "same claim" as that litigated in an earlier action, collateral estoppel precludes the subsequent adjudication of a previously determined issue, even if the subsequent action is based on an entirely different claim. *Hales*, 337 N.C. at 333, 445 S.E.2d at 594. The two doctrines are complementary in that each may apply in situations where the other would not and both

advance the twin policy goals of "protecting litigants from the burden of relitigating previously decided matters and promoting judicial economy by preventing needless litigation." *Bockweg*, 333 N.C. at 491, 428 S.E.2d at 161.

[3] Many authorities have noted that judicial estoppel is "closely related" to collateral estoppel, although "dissimilar in critical respects." *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982); *see also* 18 James Wm. Moore et al., Moore's Federal Practice § 134.30, at 134-69 (3d ed. 1997) (stating that the doctrines are "similar" but have "substantial differences"). The doctrines are similar not just in their preclusive effect, but also in their shared requirement of an identity of issues. Just as a party may not be collaterally estopped to argue an issue unless that same issue has been litigated and determined in a prior action, *Summers*, 351 N.C. at 623, 528 S.E.2d at 20, a party may not be judicially estopped to assert "inconsistent positions with respect to issues that are only superficially similar." 18 James Wm. Moore et al., Moore's Federal Practice § 134.30, at 134-69 (3d ed. 1997). The doctrines are distinguishable, on the other hand, in three principle respects. First, judicial estoppel seeks to protect the integrity of the judicial process itself, whereas collateral estoppel and res judicata seek to protect the rights and interests of the parties to an action. Rand G. Boyers, Comment, *Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel*, 80 Nw. U.L. Rev. 1244, 1248 (1986). Second, unlike collateral estoppel, judicial estoppel has no requirement that an issue have been actually litigated in a prior proceeding. *See Lowery v. Stovall*, 92 F.3d 219, 223 n.3 (4th Cir. 1996), *cert. denied*, 519 U.S. 1113, 136 L. Ed. 2d 841 (1997). Third, unlike collateral estoppel, judicial estoppel has no requirement of "mutuality" of the parties in either its offensive or defensive applications. *Id.* at 223 n.3; *see also Sartain v. Dixie Coal & Iron Co.*, 150 Tenn. 633, 650, 266 S.W. 313, 317 (1924) (judicial estoppel has no mutuality requirement because the doctrine "has nothing to do with other parties to the suit"). Because of these distinctions, judicial estoppel may apply in situations where collateral estoppel would not. *Zurich Ins. Co.*, 667 F.2d at 1166-67. Thus, although the doctrines may overlap depending on the facts of any given case, they maintain independent spheres of operation.

[4] North Carolina courts have also long recognized the doctrine of equitable estoppel, otherwise known as estoppel *in pais*. *In re Will of Covington*, 252 N.C. 546, 548, 114 S.E.2d 257, 259 (1960) (discussing the common law origins of equitable estoppel and summariz-

ing the "multitude of cases" where the doctrine has been applied in this state). Generally speaking, the doctrine applies

> "when any one, by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts exist, and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts."

*State Highway Comm'n. v. Thornton*, 271 N.C. 227, 240, 156 S.E.2d 248, 258 (1967) (quoting *Boddie v. Bond*, 154 N.C. 359, 365, 70 S.E. 824, 826 (1911)). In such a situation, the party whose words or conduct induced another's detrimental reliance may be estopped to deny the truth of his earlier representations in the interests of fairness to the other party. *Id.* In applying the doctrine, a court must consider the conduct of both parties to determine whether each has "conformed to strict standards of equity with regard to the matter at issue." *Creech v. Melnik*, 347 N.C. 520, 529, 495 S.E.2d 907, 913 (1998).

**[5]** Equitable estoppel is closely related to judicial estoppel. Indeed, some authorities have described the latter as a subset or variation of the former. *See, e.g., Eads Hide & Wool Co. v. Merrill*, 252 F.2d 80, 84 (10th Cir. 1958) (describing judicial estoppel as a "phase of equitable estoppel"). In some jurisdictions, the close connection between the doctrines has led to substantial confusion. *See, e.g., Guinness PLC v. Ward*, 955 F.2d 875, 899 (4th Cir. 1992) (noting that judicial estoppel "is frequently expressed in language sounding of estoppel in pais" but "operates independently of equitable estoppel" (quoting 1B Moore, Federal Practice, § 0.405[8], at 765-68 (2d ed. 1971))). Most authorities, however, have consistently distinguished the doctrines on the following grounds. First, equitable estoppel is designed to promote fairness between the parties, whereas judicial estoppel seeks primarily to protect the integrity of judicial proceedings. *See Edwards*, 690 F.2d at 598; *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir. 1988), *cert. denied*, 488 U.S. 967, 102 L. Ed. 2d 532 (1988). Second, as a natural consequence of this distinction in purpose, mutuality of the parties and detrimental reliance on the part of the party invoking estoppel—both elements of equitable estoppel—are not required for judicial estoppel. *See Patriot Cinemas v. Gen. Cinema Corp.*, 834 F.2d 208, 214 (1st Cir. 1987); *Konstantinidis v. Chen*, 626 F.2d 933, 937 (D.C. Cir. 1980).

[6] This Court has also recognized that branch of equitable estoppel known as "quasi-estoppel" or "estoppel by benefit." *Brooks v. Hackney*, 329 N.C. 166, 172 n.3, 173, 404 S.E.2d 854, 858 n.3, 859 (1991); *see also Shuford v. Asheville Oil Co.*, 243 N.C. 636, 646-47, 91 S.E.2d 903, 911 (1956); *Allen v. Allen*, 213 N.C. 264, 271, 195 S.E. 801, 805 (1938). Under a quasi-estoppel theory, a party who accepts a transaction or instrument and then accepts benefits under it may be estopped to take a later position inconsistent with the prior acceptance of that same transaction or instrument. *Brooks*, 329 N.C. at 173, 404 S.E.2d at 859; *see also Pure Oil Co. v. Baars*, 224 N.C. 612, 615, 31 S.E.2d 854, 856 (1944); 11A Strong's North Carolina Index 4th *Estoppel* § 13 (2001). The key distinction between quasi-estoppel and equitable estoppel is that the former may operate without detrimental reliance on the part of the party invoking the estoppel. *See Chance v. Henderson*, 134 N.C. App. 657, 665, 518 S.E.2d 780, 785 (1999); 11A Strong's North Carolina Index 4th *Estoppel* § 13 (2001); *cf.* Restatement (Second) of Conflict of Laws § 74 cmt. b (1971) (stating that under a "true" estoppel, "one party induces another to rely to his damage upon certain representations"). In comparison to equitable estoppel, quasi-estoppel is inherently flexible and cannot be reduced to any rigid formulation. *See Taylor v. Taylor*, 321 N.C. 244, 249 n.1, 362 S.E.2d 542, 546 n.1 (1987).

In light of these distinctions, quasi-estoppel may be more closely related to judicial estoppel than any other equitable doctrine. *See* Anderson & Holober, 4 Conn. Ins. L.J. at 666-69 (comparing judicial estoppel, equitable estoppel, and quasi-estoppel). Indeed, the doctrines are so similar in function and purpose that courts in other jurisdictions have occasionally used the terms interchangeably, and some commentators have classified judicial estoppel as a subset of quasi-estoppel. *See, e.g., Union Oil Co. v. State*, 804 P.2d 62, 66 n.7 (Alaska 1990) (discussing the doctrine of "judicial quasi-estoppel"); 28 Am. Jur. 2d *Estoppel and Waiver* § 74 (2000) ("Judicial estoppel is a subset of the doctrine of quasi-estoppel, which has its basis in election, waiver, acquiescence, or an acceptance of benefits.").

[7] Despite this close connection, however, there are substantial differences between the doctrines, with quasi-estoppel appearing to occupy an intermediary position between judicial estoppel and equitable estoppel. *See* Anderson & Holober, 4 Conn. Ins. L.J. at 666-69 (comparing judicial estoppel, equitable estoppel, and quasi-estoppel). As our Court of Appeals has noted, "the essential purpose of quasi-estoppel . . . is to prevent a party from benefitting by taking two

clearly inconsistent positions." *B & F Slosman v. Sonopress, Inc.*, 148 N.C. App. 81, 88, 557 S.E.2d 176, 181 (2001), *disc. rev. denied*, 355 N.C. 283, 560 S.E.2d 795 (2002). Like equitable estoppel, and unlike judicial estoppel, quasi-estoppel requires mutuality of parties; the doctrine may not be asserted by or against a "stranger" to the transaction that gave rise to the estoppel. *See In re Estate of Anderson*, 148 N.C. App. 501, 505, 559 S.E.2d 222, 225 (2002); 28 Am. Jur. 2d *Estoppel and Waiver* § 131 (2000). Like judicial estoppel, and unlike equitable estoppel, quasi-estoppel "does not require detrimental reliance *per se* by anyone." *Godley v. Cty. of Pitt*, 306 N.C. 357, 361, 293 S.E.2d 167, 170 (1982) (quoting 31 C.J.S. Estoppel § 107 (1964)). Instead, quasi-estoppel "is directly grounded . . . upon a party's acquiescence or acceptance of payment or benefits, by virtue of which that party is thereafter prevented from maintaining a position inconsistent with those acts." *Id.*; *see also Taylor v. Taylor*, 321 N.C. at 249, 362 S.E.2d at 546.

In sum, quasi-estoppel is similar to judicial estoppel in the absence of a requirement of detrimental reliance on the part of the party invoking the estoppel. Quasi-estoppel is similar to equitable estoppel in that it may not be invoked by a stranger to the transaction where the prior position was asserted. Thus, as with the other doctrines discussed above, quasi-estoppel overlaps judicial estoppel, but the doctrines are not redundant.

[8] Finally, North Carolina courts have long recognized and applied the election of remedies doctrine. *E.g.*, *Richardson v. Richardson*, 261 N.C. 521, 530, 135 S.E.2d 532, 539 (1964); *Adams v. Wilson*, 191 N.C. 392, 395-96, 131 S.E. 760, 762 (1926); *Field v. Eaton*, 16 N.C. 283, 286-87 (1829). "An election, in equity, is a choice which a party is compelled to make between the acceptance of a benefit under a written instrument, and the retention of some property already his own, which is attempted to be disposed of in favor of a third party by virtue of the same paper." *Elmore v. Byrd*, 180 N.C. 120, 122, 104 S.E. 162, 163 (1920). The doctrine "is founded on the principle that where by law or by contract there is a choice of two remedies which proceed upon opposite and irreconcilable claims of right, the one taken must exclude and bar the prosecution of the other." *Irvin v. Harris*, 182 N.C. 647, 653, 109 S.E. 867, 870 (1921). The doctrine precludes the assertion of inconsistent positions by confining a party to the position "which he first adopts." *In re Lloyd's Will*, 161 N.C. 557, 559-60, 77 S.E. 955, 956-57 (1913); *see also Sears v. Braswell*, 197 N.C. 515, 523, 149 S.E. 846, 850 (1929); *Chilton v. Groome*, 168 N.C. 639,

640-41, 84 S.E. 1038, 1039 (1915). Thus, a party asserting rights under a will, deed, or contract is " 'estopped, by claiming under it, to attack any of its provisions. . . . [O]ne who accepts the terms of [an instrument] must accept the same as a whole; one cannot accept part and reject the rest.' " *Braswell*, 197 N.C. at 523, 149 S.E. at 850 (quoting Bigelow on Estoppel, 6 ed., p. 744); *see also Field v. Eaton*, 16 N.C. at 286-87.

**[9]** Other authorities have recognized the close connection and essential differences between judicial estoppel and the doctrine of election. *See, e.g., United States v. Carrero*, 140 F.3d 327, 330 (1st Cir. 1998) (referring to judicial estoppel and election of remedies as "companion doctrines"); *Butcher v. Cessna Aircraft Co.*, 850 F.2d 247, 248 (5th Cir. 1988), *cert. denied*, 489 U.S. 1067, 103 L. Ed. 2d 812 (1989). Both are equitable doctrines that derive from the ancient common law doctrine of estoppel, and both work to preclude a party from asserting a position that is "inconsistent" with its position in a prior proceeding. *See Gens v. Resolution Trust Corp.*, 112 F.3d 569, 572 (1st Cir. 1997), *cert. denied, Gens v. Fed. Deposit Ins. Corp.*, 522 U.S. 931, 139 L. Ed. 2d 260 (1997). Neither doctrine requires the party invoking the estoppel to show that he has detrimentally relied on the prior position of the party to be estopped.[6] *See, e.g., Myers v. Ross*, 10 F. Supp. 409, 411 (S.D. Fla. 1935); *Barbe v. Villeneuve*, 505 So. 2d 1331, 1334 (Fla. 1987). Despite these similarities, however, the doctrines diverge in their purposes and scopes of application. Whereas the primary purpose of judicial estoppel is to " 'protect the integrity of the judicial process,' " *New Hampshire*, 532 U.S. at 749, 149 L. Ed. 2d at 977 (quoting *Edwards*, 690 F.2d at 598), the doctrine of election is used to "prevent double redress for a single wrong." *Smith v. Gulf Oil Corp.*, 239 N.C. 360, 368, 79 S.E.2d 880, 885 (1954). Furthermore, because it is "based upon an inconsistency of position rather than a selection of means of enforcing a right," *Eads*

---

6. We acknowledge that some of our older cases have articulated the doctrine of election in language sounding in estoppel *in pais*, where the facts would have supported application of either doctrine. *See, e.g., Holloman v. S. Ry. Co.*, 172 N.C. 372, 376, 90 S.E. 292, 293-94 (1916). Where equitable estoppel and the election of remedies doctrine overlap, such hybrid formulations are not problematic. We note, however, that where the facts have supported only the doctrine of election, and not equitable estoppel, our formulations of the election of remedies rule have not required the party invoking the estoppel to prove detrimental reliance on the position first asserted. *See, e.g., F. E. Lykes & Co. v. Grove*, 201 N.C. 254, 257, 159 S.E. 360, 362 (1931) ("[A]n election once made, with knowledge of the facts, between coexisting, remedial rights, which are inconsistent, is irrevocable and conclusive, irrespective of intent, and constitutes an absolute bar to any action, suit, or proceeding, based upon any remedial right inconsistent with that asserted by the election.")

*Hide & Wool Co.*, 252 F.2d at 84, judicial estoppel has a much broader scope of application than the doctrine of election. *Cf. Zurich Ins. Co.*, 667 F.2d at 1166-67 (judicial estoppel may apply where election of remedies would not). Thus, even though the election of remedies rule substantially overlaps judicial estoppel, the doctrines are not coextensive.

[10] In addition to invoking the specific estoppel doctrines described above, we have on other occasions estopped parties to assert inconsistent positions in the same or subsequent judicial proceeding without specifying the precise legal theory at work. *See, e.g., King v. Snyder*, 269 N.C. 148, 153, 152 S.E.2d 92, 96 (1967) ("A person appointed administrator and acting in that capacity in defending a wrongful death action is estopped from asserting therein the invalidity of his own asserted status as such administrator."); *Owens v. Voncannon*, 252 N.C. 461, 462, 114 S.E.2d 95, 96 (1960) (co-defendant who consistently denied the authority of an attorney to act as her attorney "for any purpose" could not rely on answer filed by that attorney "purportedly in behalf of all defendants"); *Kanupp v. Land*, 248 N.C. 203, 206-07, 102 S.E.2d 779, 782 (1958) (plaintiffs who had denied existence of road in prior action could not ask court in later action to locate boundaries of that road; "plaintiffs cannot ask for the location of something which they deny exists"); *Brown v. Vestal*, 231 N.C. 56, 58, 55 S.E.2d 797, 798 (1949) (defendants were not entitled to dismiss action based on an agreement the existence of which they denied in their pleadings and testimony); *Hill v. Dir.-Gen. of R.R.s*, 178 N.C. 607, 612, 101 S.E. 376, 379 (1919) (where Director General of Railroads had obtained stay of proceedings against defendant railroad on grounds that such suits must be conducted against him in his official capacity, "he should not be allowed to change his attitude and undertake a resistance as being in charge of the [railroad]"); *Fisher v. Toxoway Co.*, 165 N.C. 663, 670-71, 81 S.E. 925, 928 (1914) (where defendant's pleadings claimed title to property solely on the basis of a deed from plaintiff and that deed was later declared void, defendant could not change his position and assert a paramount title). In many of these cases, the rationale for the estoppel has come very close to that traditionally used to support judicial estoppel. *See, e.g., Rand v. Gillette*, 199 N.C. 462, 463, 154 S.E. 746, 747 (1930) ("A party is not permitted to take a position in a subsequent judicial proceeding which conflicts with a position taken by him in a former judicial proceeding, where the latter position disadvantages his adversary. . . . [H]e cannot safely 'run with the hare and hunt with the hound.' ").

We do not propose that these cases applied the doctrine of judicial estoppel without denominating it as such. Rather, these cases evince the early stirrings of judicial estoppel in the case law of this state. The purpose and effect of the estoppels applied in these cases closely approximate the purpose and effect of judicial estoppel as it has been applied in most jurisdictions. We therefore draw upon these cases, in addition to all the others cited earlier, in recognizing that judicial estoppel is a part of the common law of this state.

[11] We now turn to a close examination of the precedents cited in *New Hampshire v. Maine* in support of the United States Supreme Court's articulation of the doctrine of judicial estoppel. Because we follow the Supreme Court's reasoning in that case in our opinion today, we explore in some detail the manner in which the United States Supreme Court derived the rule of judicial estoppel from its own precedents.

In *New Hampshire*, the United States Supreme Court implicitly recognized the doctrine's deep roots in American jurisprudence, beginning its discussion of the law of judicial estoppel with the following quotation from the 1895 case, *Davis v. Wakelee*: " 'Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken . . . .' " *New Hampshire*, 532 U.S. at 749, 149 L. Ed. 2d at 977 (quoting *Davis v. Wakelee*, 156 U.S. 680, 689, 39 L. Ed. 578, 584 (1895)). The Court stated that "[t]his rule, known as judicial estoppel, 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.' " *Id.* at 749, 149 L. Ed. 2d at 977 (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8, 147 L. Ed. 2d 164, 180 n.8 (2000)).

It is important to note that *Davis v. Wakelee*, cited in *New Hampshire v. Maine* as a statement of the law of judicial estoppel, never mentions the doctrine by name. Rather, *Davis v. Wakelee* states the rule as a "general principle" and cites two distinct lines of cases expounding the doctrine of equitable estoppel and the related doctrine of "mend the hold." 156 U.S. at 689-92, 39 L. Ed. at 584-85. We believe *Davis v. Wakelee* is properly understood as an early, prototypical formulation of judicial estoppel, one that implicitly derives a new species of estoppel from earlier strands of doctrine.

The first case cited in *Davis v. Wakelee* in support of the rule quoted above is *Philadelphia, Wilmington & Baltimore Co. R.R. v. Howard,* 54 U.S. 307, 14 L. Ed. 157 (1852). In *Howard,* the United States Supreme Court held that a corporation was estopped to deny that a written instrument was intended to be a deed of the corporation where the corporation had earlier treated the instrument as bearing the corporate seal, thereby inducing the plaintiff to bring an action upon the instrument, and had prevailed at the earlier trial by asserting that the paper was a valid deed. *Id.* at 336, 14 L. Ed. at 169-70. The Court stated that these facts brought the case "within the principle of common law, that when a party asserts what he knows is false, or does not know to be true, to another's loss, and to his own gain, he is guilty of a fraud; a fraud in fact, if he knows it to be false, a fraud in law, if he does not know it to be true." *Id.* at 336, 14 L. Ed. at 170. The Court concluded, "It does not carry the estoppel beyond what is strictly equitable, to hold that the representation which defeated one action on a point of form should sustain another on a like point." *Id.* at 337, 14 L. Ed. at 170. A fair reading of *Howard* suggests that the Court applied a species of equitable estoppel, albeit in a form close to judicial estoppel. The Court's emphasis on the plaintiff having been "induced" by defendant's representations to bring an action and on plaintiff's resulting "loss" calls to mind the doctrine of equitable estoppel, which requires a showing of detrimental reliance on the part of the party asserting the estoppel. *See Stoody Co. v. Mills Alloys, Inc.,* 67 F.2d 807, 811 (9th Cir. 1933) (noting that an essential aspect of *Howard* was the fact that the "defense in the first suit was of a character to induce the plaintiff to change his ground of action"), *cert. denied,* 292 U.S. 637, 78 L. Ed. 1489 (1934). The Court also appeared willing, however, to extend the concept of estoppel beyond the relatively strict parameters of estoppel *in pais. Howard,* 54 U.S. at 337, 14 L. Ed. at 170 ("It does not carry the estoppel beyond what is strictly equitable, to hold that the representation which defeated one action on a point of form should sustain another on a like point."). Moreover, the Court's reasoning that a party should not be permitted to commit a "fraud" upon the court, *id.,* evokes the central purpose of judicial estoppel: to protect the integrity of the judicial process. *New Hampshire,* 532 U.S. at 749, 149 L. Ed. 2d at 977. Thus, *Howard* appears to occupy a gray area between equitable and judicial estoppel, perhaps marking the emergence of the latter doctrine in the United States Supreme Court's jurisprudence. *Cf.* Solum, 32 Loy. L.A. L. Rev. at 461 n.2 (describing the rule stated in *Howard* as a "principle[] of law akin to judicial estoppel" that operates as both a rule of evidence and an equitable defense).

This interpretation is bolstered by the statement in *Davis v. Wakelee* that estoppel is appropriate "*especially* if [the shift in position] be to the prejudice of the party who has acquiesced in the position formerly taken by him." 156 U.S. at 689, 39 L. Ed. at 584 (emphasis added). As discussed above, equitable estoppel requires the party asserting the estoppel to have detrimentally relied on the earlier representations of the party to be estopped. *E.g., Konstantinidis v. Chen*, 626 F.2d at 937. This is not, however, an element of judicial estoppel, which seeks to protect courts, not litigants, from manipulation. *Id.* By transmuting detrimental reliance from an essential element to a factor that makes an estoppel "especially" appropriate, the *Davis v. Wakelee* Court thus took a crucial analytical step in the evolution of the doctrine of judicial estoppel in the United States Supreme Court's jurisprudence. If *Howard* marked the emergence of a distinct offshoot from equitable estoppel, *Davis v. Wakelee* signaled its analytical independence.

The second case cited in *Davis v. Wakelee* in support of the rule articulated there is *Ry. Co. v. McCarthy*, 96 U.S. 258, 24 L. Ed. 693 (1877). In *McCarthy*, the defendant railroad proved at trial that it was incapable of transporting certain cattle on a Sunday solely because of a lack of cars. *Id.* at 265, 24 L. Ed. at 695. On appeal, the defendant alleged that it had failed to deliver the cattle because a Sunday shipment would have violated West Virginia's "Sunday Law." *Id.* at 267, 24 L. Ed. 2d at 696. The United States Supreme Court held that defendant was estopped to make this argument, reasoning that "[w]here a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to *mend his hold*." *Id.* at 267-68, 24 L. Ed. at 696 (emphasis added) (citations omitted).

*McCarthy* is probably the earliest articulation of the "mend the hold" doctrine, an equitable doctrine that precludes the assertion of inconsistent litigation positions, usually concerning the meaning of a contract, within the context of a single lawsuit. Robert Sitkoff, Comment, *"Mend the Hold" and Erie: Why an Obscure Contracts Doctrine Should Control in Federal Diversity Cases*, 65 U. Chi. L. Rev. 1059, 1064 (1998); Anderson & Holober, 4 Conn. Ins. L.J. at 692-93. The metaphor that gives the doctrine its name derives from wrestling terminology and means "to get a better grip (hold) on your opponent." *Harbor Ins. Co. v. Cont'l Bank Corp.*, 922 F.2d 357, 362 (7th Cir. 1990). Traditionally, the "mend the hold" doctrine has been

applied only to inconsistent positions asserted within the same legal proceeding, although at least one modern case has extended the doctrine to inconsistent positions asserted in two different proceedings. Anderson & Holober, 4 Conn. Ins. L.J. at 692 n.413 (citing *Rottmund v. Cont'l Assurance Co.*, 813 F. Supp. 1104, 1111 (E.D. Pa. 1992)). It is a rule generally applied in actions on a contract, most often against insurance companies that attempt to shift positions in the course of litigation in an effort to deny policyholders' claims. *Id.* at 693-94. It is unsettled whether the doctrine is a procedural rule or a substantive rule of contract law. *See AM Int'l v. Graphic Mgmt. Assocs.*, 44 F.3d 572, 576 (7th Cir. 1995).

In *Harbor Ins. Co. v. Cont'l Bank Corp.*, the United States Court of Appeals for the Seventh Circuit closely compared the doctrines of judicial estoppel and "mend the hold" and concluded that the two are "cousin[s]." 922 F.2d at 364 (applying Illinois law). The similarities between the doctrines are clear. Both judicial estoppel and the "mend the hold" rule preclude the assertion of inconsistent factual positions before a tribunal, and both serve to preserve judicial resources, protect judicial integrity, and boost public confidence in the fairness of the judicial system. Anderson & Holober, 4 Conn. Ins. L.J. at 698. In light of these strong similarities, it is not surprising that the United States Supreme Court would cite *McCarthy*, a case applying the "mend the hold" rule, in support of its nascent formulation of judicial estoppel in *Davis v. Wakelee*. The latter doctrine is in many ways a natural extension of the former.

Returning to an analysis of our own precedents, we believe that the evolution of our estoppel jurisprudence parallels that of the United States Supreme Court. We have already explained that the doctrine of equitable estoppel has deep roots in the jurisprudence of this state. In addition, we have recognized and approved the "mend the hold" rule, as stated by the United States Supreme Court in *McCarthy*, on at least two occasions. *Standard Accident Ins. Co. v. Harrison-Wright Co.*, 207 N.C. 661, 672, 178 S.E. 235, 241 (1935) (under *McCarthy*, insurer not permitted to "mend his hold" by denying that policy covered insured, where insurer's prior representations to court had implicitly acknowledged the contrary); *McAden v. R.F. Craig*, 222 N.C. 497, 499, 24 S.E.2d 1, 3-4 (1943) (quoting *McCarthy* and precluding defendant from reversing position asserted in his answer as an apparent "afterthought" suggested by "the pressure and exigencies of the case"). We have also applied a different formulation of the rule on at least five other occasions, stating in each case that

"[i]t is well understood that, except in proper instances, a party to a suit should not be allowed to change his position with respect to a material matter in the course of litigation." *Roberts v. Grogan*, 222 N.C. 30, 33, 21 S.E.2d 829, 830 (1942) (adding that a party "cannot swap horses in midstream"); *Kannan*, 182 N.C. at 78, 108 S.E. at 384 (adding that a party should not be permitted to "blow hot and cold in the same breath"); *Hylton v. Mount Airy*, 227 N.C. 622, 626, 44 S.E.2d 51, 54 (1947); *Clark v. Harris*, 187 N.C. 251, 251, 121 S.E. 453, 453 (1924); *Ingram v. Yadkin River Power Co.*, 181 N.C. 359, 360, 107 S.E. 209, 209 (1921).

As the United States Supreme Court did in *Wakelee*, we now draw upon our equitable estoppel and "mend the hold" precedents in support of our recognition of the doctrine of judicial estoppel. Although the doctrines are not equivalent, they substantially overlap and are motivated by a similar set of policy concerns. Anderson & Holober, 4 Conn. Ins. L.J. at 637. Together with the other doctrines previously discussed, these two doctrines demonstrate that the common law of this state has long recognized the importance of protecting the integrity of judicial proceedings, and the appropriateness, under certain circumstances, of invoking some form of estoppel to promote that salutary objective.

As the foregoing discussion demonstrates, North Carolina courts have previously recognized several doctrines that may be used, under prescribed circumstances, to preclude the assertion of inconsistent positions before a tribunal. Judicial estoppel, however, is distinguishable from its companion doctrines in two principle respects. First, judicial estoppel seeks to protect courts, not litigants, from individuals who would play "fast and loose" with the judicial system. *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990), *superceded in part on other grounds by statute as stated in Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir. 1994). This essential purpose necessarily limits the application of judicial estoppel relative to those doctrines that may be applied when litigants, not courts, are threatened by a party's shift in position. Second, because of its inherent flexibility as a discretionary equitable doctrine, judicial estoppel plays an important role as a gap-filler, providing courts with a means to protect the integrity of judicial proceedings where doctrines designed to protect litigants might not adequately serve that role. *See Guinness*, 955 F.2d at 898-900; *Zurich Ins. Co.*, 667 F.2d at 1166-67.

Of course, there is no need for judicial estoppel where previously established doctrines would preclude the assertion of an inconsistent

position. *See Estate of Burford v. Burford*, 935 P.2d 943, 948 (Colo. 1997). But where the technical requirements of mutuality, reliance, or prejudice might render these rules inapplicable, judicial estoppel provides courts with a discretionary tool "to protect the integrity of the courts and the judicial process." *Guinness*, 955 F.2d at 899. Thus, judicial estoppel dovetails with other well-established doctrines to substantially promote that ancient and overarching estoppel principle which "lies at the foundation of all fair dealing between [persons], and without which, it would be impossible to administer law as a system." *Armfield*, 44 N.C. at 161.

### III.

[12] With this understanding of the nature and evolution of judicial estoppel in mind, we now turn to an analysis of the issues raised in this appeal. Because it is central to the disposition of this case, we begin with the question of how the doctrine of judicial estoppel should be applied in North Carolina. This is a question of first impression for this Court.

Plaintiff asks us to adopt the "narrow view" of judicial estoppel set forth in *Medicare Rentals, Inc. v. Advanced Servs.*, 119 N.C. App. 767, 460 S.E.2d 361 and applied in the instant case by the Court of Appeals. Plaintiff offers no reasons, however, why this definition of judicial estoppel is preferable to any other. We therefore structure our discussion of this issue around the Court of Appeals' analysis.

The Court of Appeals delineated two doctrinal variations of judicial estoppel in the instant proceeding. First, the Court of Appeals cited the Fourth Circuit case of *Sedlack v. Braswell Servs. Group* in formulating the "federal" test for judicial estoppel as follows: "This three-pronged test requires that (1) the estopped party assert a position that is factually inconsistent with that taken in prior litigation; (2) the estopped party intentionally misled the court to gain an unfair advantage; and (3) the prior position be accepted by the court." *Whitacre P'ship v. Biosignia, Inc.*, 153 N.C. App. 608, 614, 574 S.E.2d 475, 479-80 (2002) (citing *Sedlack v. Braswell Servs. Group*, 134 F.3d 219, 224 (4th Cir. 1998)). Second, the Court of Appeals set out and applied its own "narrower view" of judicial estoppel, a formulation announced in *Medicare Rentals*, 119 N.C. App. 767, 460 S.E.2d 361. *Whitacre P'ship*, 153 N.C. App. at 614, 574 S.E.2d at 480. In *Medicare Rentals*, the Court of Appeals stated that "[j]udicial estoppel is a harsh doctrine and requires at a minimum that the party against whom the doctrine is asserted intentionally

have changed its position in order to gain an advantage." 119 N.C. App. at 771, 460 S.E.2d at 364.

While it is true that *Sedlack* described the three prongs of its test as "three elements [that] must always be satisfied," *Sedlack*, 134 F.3d at 224, the United States Supreme Court in *New Hampshire v. Maine* emphasized that because the doctrine is a flexible, equitable one, " 'the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle.' " *New Hampshire*, 532 U.S. at 750, 149 L. Ed. 2d at 978 (quoting *Zurich Ins. Co.*, 667 F.2d at 1166). Thus, judicial estoppel requires discretionary weighing of the relevant "factors," not rote application of "inflexible prerequisites or an exhaustive formula." *Id.* at 751, 149 L. Ed. 2d at 978. Similarly, under the *Medicare Rentals* test, judicial estoppel requires "at a minimum" a showing of intentional misrepresentation to gain advantage. *Medicare Rentals*, 119 N.C. App. at 771, 460 S.E.2d at 364. Insofar as the *Medicare Rentals* test suggests that judicial estoppel can be reduced to "inflexible prerequisites or an exhaustive formula," *New Hampshire*, 532 U.S. at 751, 149 L. Ed. 2d at 978, it too fails to adequately recognize the inherently flexible nature of this discretionary equitable doctrine. Thus, we decline to accept either version of the doctrine articulated by the Court of Appeals, and instead follow the test set forth by the United States Supreme Court in *New Hampshire v. Maine.*

In *New Hampshire v. Maine*, the United States Supreme Court applied the doctrine of judicial estoppel to preclude the State of New Hampshire from asserting that a portion of the New Hampshire-Maine border ran along the Maine shore when it had successfully argued in a previous action that the same portion of that border was located at the center of the Piscataqua River's main navigable channel. 532 U.S. 742, 149 L. Ed. 2d 968. The Court stated that the purpose of the doctrine was " 'to protect the integrity of the judicial process,' " *id.* at 749, 149 L. Ed. 2d at 977 (quoting *Edwards*, 690 F.2d at 598), "by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment,' " *id.* at 750, 149 L. Ed. 2d at 977 (quoting *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993), *cert. denied*, 511 U.S. 1042, 128 L. Ed. 2d 211 (1994)). Noting that " 'the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle,' " *id.* at 750, 149 L. Ed. 2d at 978 (quoting *Zurich Ins. Co.*, 667 F.2d at 1166), the Court enumerated three factors that "typically inform the decision whether to apply the doctrine in a par-

ticular case." *Id.* at 750, 149 L. Ed. 2d at 978. First, a party's subsequent position "must be 'clearly inconsistent' with its earlier position."[7] *Id.* (quoting *United States v. Hook*, 195 F.3d 299, 306 (7th Cir. 1999), *cert. denied*, 529 U.S. 1082, 146 L. Ed. 2d 510 (2000)). "Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding" might pose a "threat to judicial integrity" by leading to " 'inconsistent court determinations' " or " 'the perception that either the first or the second court was misled.' " *Id.* at 750-51, 149 L. Ed. 2d at 978 (quoting *United States v. C. I. T. Constr. Inc.*, 944 F.2d 253, 259 (5th Cir. 1991) (inconsistent court determinations) and *Edwards*, 690 F.2d at 599 (risk of either court being misled)). Third, courts consider "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 751, 149 L. Ed. 2d at 978.

Applying these factors, the United States Supreme Court concluded that they "tip[ped] the balance of equities in favor of barring New Hampshire's present complaint." *Id.* The Court emphasized, however, that these three factors "do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel" and that "[a]dditional considerations may inform the doctrine's application in specific factual contexts." *Id.*; *cf. Zurich Ins. Co.*, 667 F.2d at 1167 (stating that although judicial acceptance of a party's prior position is not an absolute prerequisite for judicial estoppel, it is "obviously more appropriate" in that situation). Finally, the Court noted that "judicial estoppel 'is an equitable doctrine invoked by a court at its discretion.' " *Id.* at 750, 149 L. Ed. 2d at 978 (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990), *cert.*

---

7. We note that among the three "factors" enumerated by the United States Supreme Court, the "clearly inconsistent" requirement alone appears to be an essential element which "must be" present in order for judicial estoppel to be applicable. The Court's mandatory language ("must be") supports this conclusion, as do a multitude of federal opinions that have explored this aspect of the doctrine. *See, e.g., Wight v. BankAmerica Corp.*, 219 F.3d 79, 90 (2d Cir. 2000) (judicial estoppel requires a "true inconsistency" such that the two statements "cannot be reconciled"); *Faigin v. Kelly*, 184 F.3d 67, 82 (1st Cir. 1999) (a party's statements must be "directly inconsistent" to support application of judicial estoppel); *see also* 28 Am. Jur. 2d *Estoppel and Waiver* § 74 (2003) (judicial estoppel applies only where "the truth of one position must necessarily preclude the truth of the other position"); Brown, 75 Am. Bankr. L.J. at 223 (noting that all federal circuits are in agreement on this point). Common sense also dictates this interpretation of the first *New Hampshire* "factor." A doctrine that precludes the assertion of *inconsistent* positions obviously cannot preclude the assertion of *consistent* positions, whatever the equities of the situation might be.

*denied*, 501 U.S. 1260, 115 L. Ed. 2d 1078 (1991)). Thus, "it may be appropriate to resist application of judicial estoppel 'when a party's prior position was based on inadvertence or mistake.' " *Id.* at 753, 149 L. Ed. 2d at 979-80 (quoting *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 29 (4th Cir. 1995)).

We are persuaded that *New Hampshire v. Maine* best character-izes our common law doctrine of judicial estoppel and thus follow the United States Supreme Court's doctrinal formulation without hesita-tion. With a view toward providing appropriate guidance to our trial courts in their application of judicial estoppel, however, we pause to observe two important limitations on our holding.

[13] As an initial matter, our recognition of judicial estoppel is lim-ited to civil proceedings. *New Hampshire v. Maine* did not squarely address the applicability of the doctrine in the criminal context, and we believe public policy considerations militate against extending the doctrine to that arena. We address this issue from two stand-points: (1) whether judicial estoppel may be applied against a crimi-nal defendant and (2) whether judicial estoppel may be applied against the government in a criminal case.

First, judicial estoppel should not ordinarily be applied against a criminal defendant. Although the United States Supreme Court did cite three criminal cases in *New Hampshire v. Maine*, the Court took no express position on the applicability of judicial estoppel to crimi-nal proceedings, and in none of these cases was judicial estoppel actually applied against a defendant. *See Russell*, 893 F.2d 1033; *Hook*, 195 F.3d 299; *McCaskey*, 9 F.3d 368. Moreover, in only one of those cases was judicial estoppel applied at all. *See Russell*, 893 F.2d 1033 (applying judicial estoppel against the state). It appears that "[t]he Supreme Court in *New Hampshire* was . . . simply collecting cases in which judicial estoppel was *discussed*, not where it was applied." *Beem v. McKune*, 317 F.3d 1175, 1193 (10th Cir. 2003) (McKay, J., dis-senting), *cert. denied*, —— U.S. ——, 157 L. Ed. 2d 24 (2003). Hence, *New Hampshire* leaves unresolved the question of the applicability of judicial estoppel in the criminal context.

The policies undergirding judicial estoppel must sometimes yield to countervailing policy concerns. As the Ninth Circuit has noted, given the high stakes of criminal prosecutions and the special pro-tections traditionally afforded criminal defendants, "[j]ustice would not be served by holding [a criminal] defendant to [his or her] prior false statements, because to do so would assign a higher value to the

'sanctity of the oath' than to the guilt or innocence of the accused." *Morris v. California*, 966 F.2d 448, 453 (9th Cir. 1992), *cert. denied*, 506 U.S. 831, 121 L. Ed. 2d 57 (1992). It is not surprising, then, that "[n]o circuit has ever applied the doctrine of judicial estoppel to bar a criminal defendant from asserting a claim based on innocence." *Id.* In light of these concerns, we agree with the Ninth Circuit's conclusion that "[t]he judicial process can more easily survive a rule that precludes the use of judicial estoppel to keep intact convictions of innocent persons than it can a rule that purports to preserve judicial sacrosanctity by leaving wrongful convictions in place as a sanction for lying." *Id.*

Second, judicial estoppel should not ordinarily be applied against the government in a criminal proceeding. *See, e.g., Thompson v. Calderon*, 120 F.3d 1045, 1070 (9th Cir. 1997), *rev'd and remanded on other grounds*, 523 U.S. 538, 140 L. Ed. 2d 728 (1998); *Nichols v. Scott*, 69 F.3d 1255, 1272 (5th Cir. 1995); *United States v. Kattar*, 840 F.2d 118, 129-30 n.7 (1st Cir. 1988); *Smith v. State*, 765 N.E.2d 578, 583 (Ind. 2002); *see also United States v. Simmons*, 247 F.3d 118, 124 (4th Cir. 2001). In North Carolina, such a restriction on the doctrine is necessitated by the structure of our criminal justice system. A prosecutor is under a constitutional duty to enforce the criminal law by prosecuting criminal actions on behalf of the state. N.C. Const. art. IV, § 18; *State v. Prevatte*, 356 N.C. 178, 237, 570 S.E.2d 440, 472 (2002) ("prosecutor has the duty to vigorously present the State's case"), *cert. denied*, —— U.S. ——, 155 L. Ed. 2d 681 (2003); *see also State v. Blakeney*, 352 N.C. 287, 312, 531 S.E.2d 799, 817 (2000), *cert. denied*, 531 U.S. 1117, 148 L. Ed. 2d 780 (2001). We have frequently emphasized that prosecutors must be given "wide latitude" in framing their arguments in the pursuit of this constitutional duty. *E.g., State v. Flowers*, 347 N.C. 1, 36-37, 489 S.E.2d 391, 411-12 (1997), *cert. denied*, 522 U.S. 1135, 140 L. Ed. 2d 150 (1998); *State v. Monk*, 286 N.C. 509, 515, 212 S.E.2d 125, 131 (1975). Moreover, as the United States Supreme Court stated in *New Hampshire*, " 'When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined.' " 532 U.S. at 755, 149 L. Ed. 2d at 981 (quoting *Heckler v. Cmty. Health Servs.*, 467 U.S. at 60, 81 L. Ed. 2d at 52). Thus, in light of the state's unique status as a litigant and its interest in enforcing the criminal law, "it is well settled that the Government may not be estopped on the same terms as any other litigant." *Id.* In sum, the strong public interest in

maintaining prosecutorial independence normally precludes application of judicial estoppel against the government in criminal cases.

**[14]** Next, we emphasize that our recognition of judicial estoppel is limited to the context of inconsistent factual assertions and that the doctrine should not be applied to prevent the assertion of inconsistent legal theories. Although not addressed in *New Hampshire v. Maine*, this limitation on the reach of judicial estoppel has been adopted by the majority of courts to consider the matter. *See, e.g., Wight v. BankAmerica Corp.*, 219 F.3d at 90; *Pittson Co. v. United States*, 199 F.3d 694, 701 n.4 (4th Cir. 1999); *Lowery*, 92 F.3d at 224; *Royal Ins. Co. v. Quinn-L Capital Corp.*, 3 F.3d 877, 885 n.6 (5th Cir. 1993), *cert. denied*, 511 U.S. 1032, 128 L. Ed. 2d 193 (1994); *Hayne Fed. Credit Union v. Bailey*, 327 S.C. at 251-52, 489 S.E.2d at 477. Moreover, such a limitation is necessary to avoid interference with our liberal pleading rules, which permit a litigant to assert inconsistent, even contradictory, legal positions within a lawsuit. N.C.G.S. § 1A-1, Rule 8 (2003); *see also Zurich Ins. Co.*, 667 F.2d at 1167; *Montrose Med. Corp. Particip. Savings Plan v. Bulger*, 243 F.3d 773, 782 (3d Cir. 2001). In sum, while other doctrines such as "mend the hold" and judicial admissions may restrict the extent to which a party may assert contradictory legal positions, the doctrine of judicial estoppel limits only inconsistent assertions of fact.

**[15]** Having delineated the doctrine of judicial estoppel, we now turn to an issue that concerns its application here. Plaintiff argues, and the Court of Appeals held, that judicial estoppel does not apply in this case because there was "no evidence that Dr. Whitacre intentionally misled the court" by "intentionally manipulat[ing] or hid[ing] the truth to gain an unfair advantage." *Whitacre P'ship*, 153 N.C. App. at 615-16, 574 S.E.2d at 480. This holding comports with the definition of judicial estoppel previously adopted by the Court of Appeals. *See Medicare Rentals*, 119 N.C. App. at 771, 460 S.E.2d at 364. A trial court applying judicial estoppel, however, is not obliged to specifically determine that the party to be estopped intended to mislead that court by its representations in the later action. As the United States Supreme Court emphasized in *New Hampshire v. Maine*, judicial estoppel is a "flexible equitable doctrine," and the " 'circumstances under which [it] may appropriately be invoked are probably not reducible to any general formulation of principle.' " 532 U.S. at 750, 149 L. Ed. 2d at 978 (quoting *Zurich Ins. Co.*, 667 F.2d at 1166). While it would weigh heavily in favor of invoking the doctrine, intent to deceive is not enumerated in *New Hampshire* as one of the relevant

factors. *New Hampshire*, 532 U.S. 742, 149 L. Ed. 2d 968. Moreover, *New Hampshire v. Maine* specifically provides that "it may be appropriate to resist application of judicial estoppel 'when a party's prior position was based on inadvertence or mistake.' " *Id.* at 753, 149 L. Ed. 2d at 979 (quoting *John S. Clark Co.*, 65 F.3d at 29). In stating that it "may be appropriate" to "resist" application of judicial estoppel under these circumstances, the United States Supreme Court implicitly rejected the proposition that the subsequent position *must be* intended to deceive in order for the doctrine to apply.

We are mindful that the application of judicial estoppel to preclude a party from making a *true* factual assertion in a later proceeding because it contradicts a *false* factual assertion made in an earlier one may be seen as interfering with the truth-seeking function of courts. *See Teledyne Indus., Inc. v. Nat'l Labor Relations Bd.*, 911 F.2d 1214, 1218 (6th Cir. 1990) (noting that judicial estoppel may "imping[e] on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement"). As we said long ago in a related context, estoppels, while valuable to help "prevent that which deals in duplicity and inconsistency," by their nature run the risk of "shut[ting] out the *real* truth" in favor of its "artificial *representative*." *Jones v. Sasser*, 18 N.C. 452, 464 (1836). Upon careful reflection, we are not dissuaded by these concerns. First, judicial estoppel is to be applied in the sound discretion of our trial courts. If a trial court believes that justice would not be served by judicially estopping a party's factual contention, it may decline to do so. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 365 (3d Cir. 1996) ("[Judicial estoppel] is not meant to be a technical defense for litigants seeking to derail potentially meritorious claims, especially when the alleged inconsistency is insignificant at best and there is no evidence of intent to manipulate or mislead the courts."). We are confident that our trial courts will apply the doctrine judiciously, and not in a reflexive or technical manner that would defeat its underlying purpose. *See id.* at 358 ("Judicial estoppel is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from 'playing "fast and loose with the courts." ' ") (citations omitted). Second, the "truth-defeating" potential of judicial estoppel is somewhat counterbalanced by its prophylactic effect. In practice, the doctrine tends not to subvert the truth because it encourages litigants to tell the truth in the first place by " 'rais[ing] the cost of lying.' " *Int'l Union, UMW v. Marrowbone Dev. Co.*, 232 F.3d 383, 391 (4th Cir. 2000) (quoting *Chaveriat v.*

*Williams Pipe Line Co.*, 11 F.3d 1420, 1427-28 (7th Cir. 1993)). Third, the doctrine expressly guides our trial courts to consider whether a party's prior position was innocently asserted. We follow the lead of the United States Supreme Court in stressing that "it may be appropriate to resist application of judicial estoppel 'when a party's prior position was based on inadvertence or mistake.' " *New Hampshire*, 532 U.S. at 753, 149 L. Ed. 2d at 979 (quoting *John S. Clark Co.*, 65 F.3d at 29); *see also Ryan Operations*, 81 F.3d at 364 (court unwilling to administer "strong medicine" of judicial estoppel "to treat careless or inadvertent nondisclosures"). Thus, while we do not impose any particular *scienter* requirement on what must remain an inherently flexible equitable doctrine, we remind our trial courts to carefully balance the equities in applying judicial estoppel, and emphasize that a reasonable justification for a party's change in position may militate against its application in a particular case. *See, e.g., Morris v. California*, 966 F.2d at 453; *In re Corey*, 892 F.2d 829, 836 (9th Cir. 1989), *cert. denied sub nom. Kulalani, Ltd. v. Corey*, 498 U.S. 815, 112 L. Ed. 2d 31 (1990).

**[16]** Plaintiff next argues that Whitacre was acting in his individual capacity, and not as a general partner of Whitacre Partnership, when he filed his bankruptcy petition and gave testimony at the 341 meeting with the bankruptcy trustee and his creditors. According to plaintiff, North Carolina partnership law precludes an estoppel against Whitacre Partnership based on representations made by Whitacre during the bankruptcy proceeding. Because Whitacre was not "apparently carrying on in the usual way the business of the partnership of which he is a member," plaintiff argues, his representations at the bankruptcy proceeding cannot "bind[] the partnership." N.C.G.S. § 59-39(a) (2003). The Court of Appeals found this argument persuasive, holding that summary judgment was precluded because a genuine issue of material fact remained as to whether Whitacre's statements at the 341 hearing were " 'for the purposes of [the partnership's] business,' and were made for 'carrying on in the usual way the business of the partnership'. so as to bind the partnership." *Whitacre P'ship*, 153 N.C. App. at 615, 574 S.E.2d at 480 (quoting N.C.G.S. § 59-39(a) (2001)).

The issue in the instant case, however, is not whether Whitacre was acting within his authority as a general partner of Whitacre Partnership when he represented to the bankruptcy court that Whitacre Partnership's shares could never vest. Rather, the issue is whether plaintiff can be judicially estopped from asserting a position

in one legal proceeding contradictory to representations made by its general partners in an earlier legal proceeding. This issue, in turn, raises two additional questions: (1) whether judicial estoppel may be applied not just to the parties to a prior action but also to their "privies" and (2) whether plaintiff and its general partners are in "privity" with one another in this case.

Plaintiff suggests that under *New Hampshire v. Maine*, judicial estoppel applies only against a "party" who asserts inconsistent positions in subsequent legal proceedings. Because Whitacre Partnership was a not a party to the Whitacres' bankruptcy proceeding, plaintiff appears to argue, Whitacre Partnership cannot be judicially estopped on the basis of the Whitacres' representations in that proceeding. Plaintiff bases this argument on its observation that the United States Supreme Court in *New Hampshire* never mentioned "privity" or "privies" and referred throughout the opinion to the application of the doctrine against a "party" or "parties." We think plaintiff makes too much of this observation. In *New Hampshire*, the United States Supreme Court did not discuss privity because it had no need to do so. In that case, the parties before the Court, the states of New Hampshire and Maine, had also been parties to the previous action in which the prior inconsistent statement was made. *New Hampshire*, 532 U.S. at 747-48, 149 L. Ed. 2d at 975-76. The Court was not called upon to consider whether the privity concept applied to judicial estoppel, and did not expressly limit judicial estoppel to "parties" as opposed to "privies."

In the present case, by contrast, we are faced with a corporation seeking to estop a partnership from contradicting prior representations made by the partnership's general partners in a Chapter 7 bankruptcy proceeding. Since Whitacre Partnership itself was not a party to the bankruptcy proceeding, there is no mutuality of estoppel, and we are forced to decide whether a privity relationship may sustain the application of judicial estoppel.

This Court has consistently applied the privity concept to a variety of estoppel doctrines. *See, e.g., McInnis*, 318 N.C. at 428, 349 S.E.2d at 556 (res judicata and collateral estoppel apply to the "same parties or those in privity with them"); *Mansour v. Rabil*, 277 N.C. 364, 377, 177 S.E.2d 849, 857 (1970) (under doctrine of election, heirs and devisees of one who accepts benefits under a will are estopped to contest that will); *Smith v. Smith*, 265 N.C. 18, 28, 143 S.E.2d 300, 307 (1965) (estoppel of record binds parties and their privies); *Long v. Trantham*, 226 N.C. 510, 514, 39 S.E.2d 384, 387 (1946) (equitable

estoppel binds parties and their privies); *see also In re Estate of Anderson*, 148 N.C. App. 501, 505, 559 S.E.2d 222, 225 (2002) (privity concept extended to quasi-estoppel). *See generally* 11A Strong's North Carolina Index 4th *Estoppel* § 2 (2001) ("Where a party would be estopped, persons in privity with that party, including heirs and devisees, are estopped."). "In general, 'privity involves a person so identified in interest with another that he represents the same legal right.' " *Tucker*, 344 N.C. at 417, 474 S.E.2d at 130 (quoting 47 Am. Jur. 2d *Judgments* § 663 (1995)). Although the meaning of "privity" has proven to be elusive, and "there is no definition of the word . . . which can be applied in all cases," the prevailing definition in our cases, at least in the context of res judicata and collateral estoppel, is that privity "denotes a mutual or successive relationship to the same rights of property." *Id.* at 416-17, 474 S.E.2d at 130 (quoting *Hales*, 337 N.C. at 333-34, 445 S.E.2d at 594 (citations omitted)). In determining whether such a privity relation exists, " 'courts will look beyond the nominal party whose name appears on the record as plaintiff and consider the legal questions raised as they may affect the real party or parties in interest.' " *Summers*, 351 N.C. at 623-24, 528 S.E.2d at 21 (quoting *Davenport v. Patrick*, 227 N.C. 686, 688, 44 S.E.2d 203, 205 (1947)).

In deciding whether judicial estoppel applies not only to parties, but also to their privies, it is instructive to consider the rationale for applying the privity concept in the collateral estoppel context. Due process requires that persons be given a fair opportunity to litigate their legal rights. U.S. Const. amends. V, XIV; *Windsor v. McVeigh*, 93 U.S. 274, 277, 23 L. Ed. 914, 915-16 (1876). This right to be heard may prohibit the application of a preclusion doctrine to estop a party who never had a chance to present arguments and evidence in a prior action from doing so at a later proceeding. *Blonder-Tongue Lab., Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 328-29, 28 L. Ed. 2d 788, 799-800 (1971) (discussing due process limitations to collateral estoppel). It is well settled, however, that where there is a sufficiently close relationship, called "privity," between the party to a prior action and the party to be estopped in a later action, due process is not offended by the estoppel of the latter, provided the former had a full and fair opportunity to litigate the matter to be precluded. *See, e.g., Richards v. Jefferson Cty.*, 517 U.S. 793, 797-99, 135 L. Ed. 2d 76, 83-84 (1996) (describing the constitutional rationale for allowing preclusion doctrines to estop a "privy" to a prior action from relitigating claims and issues); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.7, 58 L. Ed. 2d 552, 559 n.7 (1979) ("It is a violation of due

process for a judgment to be binding on a litigant who was not a party *or a privy* and therefore has never had an opportunity to be heard.") (emphasis added) (citations omitted); *McInnis*, 318 N.C. at 433-34, 349 S.E.2d at 559-60 (following *Blonder-Tongue* and *Parklane Hosiery* and abandoning the strict mutuality requirement for collateral estoppel in North Carolina).

We observe that other courts have applied the privity concept to the doctrine of judicial estoppel. *See, e.g., In re Johnson*, 518 F.2d 246, 252 (10th Cir. 1975); *Farmers High Line Canal & Reservoir Co. v. City of Golden*, 975 P.2d 189, 202 (Colo. 1999); *Barnett v. Develle*, 289 So. 2d 129, 138 (La. 1974); *Messler v. Simmons Gun Specialties, Inc.*, 687 P.2d 121, 128 (Okla. 1984); *Tracy Loan & Trust Co. v. Openshaw Inv. Co.*, 102 Utah 509, 515, 132 P.2d 388, 390 (1942); *see also* 28 Am. Jur. 2d § 129 *Estoppel and Waiver* (2000); Anderson & Holober, 4 Conn. Ins. L.J. at 608-09. We agree that "a rigid rule requiring the estopped party to be the identical party as in the earlier proceeding would unnecessarily diminish the protective function of the doctrine of judicial estoppel." *Capsopoulos v. Chater*, 1996 U.S. Dist. LEXIS 18330 (N.D. Ill. Dec. 9, 1996); *see also Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir. 1998). Moreover, so long as the party to be judicially estopped is a privy of the party who made the prior inconsistent statement before a tribunal, due process is not offended by the lack of mutuality of the parties between the two proceedings. *See Richards v. Jefferson Cty.*, 517 U.S. at 797-99, 135 L. Ed. 2d at 83-84.

[17] We do not address whether the Whitacres, as general partners of Whitacre Partnership, were in privity with the partnership. Whether privity exists in a given case should generally be resolved by the trial court in the first instance. *See Lowell Staats Mining Co. v. Philadelphia Elec. Co.*, 878 F.2d 1271, 1276 (10th Cir. 1989); *Vulcan, Inc. v. Fordees Corp.*, 658 F.2d 1106, 1109 (6th Cir. 1981), *cert. denied*, 456 U.S. 906, 72 L. Ed. 2d 162 (1982); *Astron Indus. Assocs. v. Chrysler Motors Corp.*, 405 F.2d 958, 961 (5th Cir. 1968); *Towle v. Boeing Airplane Co.*, 364 F.2d 590, 592 (8th Cir. 1966); *see also Gerrard v. Larsen*, 517 F.2d 1127, 1135 (8th Cir. 1975) (privity is appropriately "resolved on a case by case basis by an examination of underlying facts and circumstances"). We cannot discern whether the trial court made a privity determination in the present case. The parties did not brief the issue in their summary judgment memoranda, and no published appellate decisions in this state have previously discussed the applicability of the privity concept to judicial estoppel.

Thus, rather than usurping the trial court's role by making a privity determination on the basis of a cold record, we deem it advisable to reserve this factual question for the trial court to address on remand. *Cf. Maggio v. Zeitz*, 333 U.S. 56, 77, 92 L. Ed. 476, 492 (1948) (remand to trial court appropriate where lower courts have adjudicated parties' rights "without considering essential facts in light of the controlling law"); *Gerdes v. Lustgarten*, 266 U.S. 321, 327-28, 69 L. Ed. 309, 312-13 (1924) (remand to trial court appropriate where trial court did not decide questions of fact upon which ultimate decision must rest); *Marconi Wireless Tel. Co. v. Simon*, 246 U.S. 46, 57, 62 L. Ed. 568, 573-74 (1918) (delay in ultimate disposition of case resulting from remand preferable to Court's exercising "a duty which it was the province of the court below to perform"). This disposition reflects trial courts' "institutional advantages" over appellate courts in the "application of facts to fact-dependent legal standards." *Augur v. Augur*, 356 N.C. 582, 586, 573 S.E.2d 125, 129 (2002).

**[18]** Moreover, we are unable to determine from the record what precise formulation of judicial estoppel the trial court applied to the facts of the instant case. Assuming that the trial court applied the law of judicial estoppel as it had been articulated by our appellate courts up to now, *see Medicare Rentals*, 119 N.C. App. at 769-71, 460 S.E.2d at 363-64, *State v. Taylor*, 128 N.C. App. at 400, 496 S.E.2d at 815, the court necessarily applied a version of the doctrine substantially different from the one we delineate today. Because the trial judge "did not have the legal standard which we articulate today to guide him in his consideration of the case, . . . it is not reasonable to expect him to have applied it without the benefit of this opinion." *State v. McDowell*, 310 N.C. 61, 74, 310 S.E.2d 301, 310 (1984), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 732 (1986), *cert. denied*, 489 U.S. 1033, 103 L. Ed. 2d 230 (1989). Accordingly, we remand to the Court of Appeals for further remand to the trial court for reconsideration of defendants' motion for summary judgment in light of our newly articulated standards concerning judicial estoppel and the applicability of the privity concept. *See id.* at 75, 310 S.E.2d at 309.

**[19]** We note that a trial court's application of judicial estoppel is reviewed for abuse of discretion. *See New Hampshire*, 532 U.S. at 750, 149 L. Ed. 2d at 977-78 ("[J]udicial estoppel is an equitable doctrine invoked by a court at its discretion."); *see also Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001); *Taylor v. Food World*, 133 F.3d 1419, 1422 (11th Cir. 1998); *McNemar v. Disney Store*, 91 F.3d 610, 616-17 (3d Cir. 1996), *cert. denied*, 519 U.S.

1145, 136 L. Ed. 2d 845 (1997), *overruled on other grounds by Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 143 L. Ed. 2d 966 (1999); *State v. Taylor*, 128 N.C. App. at 400, 496 S.E.2d at 815-16. Moreover, as the Court of Appeals properly recognized, "[w]hen an action pled is barred by a legal impediment, such as judicial estoppel, there are no triable issues of fact as a matter of law." *Whitacre P'ship*, 153 N.C. App. at 614, 574 S.E.2d at 479 (citing *Andrews v. Davenport*, 84 N.C. App. 675, 677, 353 S.E.2d 671, 673 (1987), *disc. review denied*, 319 N.C. 671, 356 S.E.2d 774 (1987)). Thus, when a trial court has acted within its discretion in applying judicial estoppel, leaving no triable issues of material fact, summary judgment is appropriate. *See Montrose*, 243 F.3d at 779 ("Summary judgment is appropriate when operation of judicial estoppel renders a litigant unable to state a prima facie case."); *West Delta Oil Co. v. Hof*, 2002 U.S. Dist. LEXIS 15776, at *7 (E.D. La. 2002) (application of judicial estoppel in context of summary judgment motion is reviewed for abuse of discretion); *cf. Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-43, 139 L. Ed. 2d 508, 516 (1997) (rejecting argument that ruling on admissibility of expert testimony should be reviewed *de novo* simply because it arose in the "outcome determinative" context of a summary judgment motion, and instead reviewing for abuse of discretion).

In conclusion, the doctrine of judicial estoppel is a part of the common law of this state. In the instant case, however, the trial court did not have the benefit of the precise formulation of the doctrine we articulate in this opinion. Moreover, judicial estoppel is a discretionary doctrine, and the privity inquiry required here is a fact-intensive one. Thus, we instruct the trial judge on remand to determine whether the Whitacres and Whitacre Partnership are in privity and, if so, to exercise discretion in determining whether the doctrine of judicial estoppel is applicable in the instant case. Accordingly, we remand to the Court of Appeals for further remand to the trial court for further proceedings consistent with this opinion.

MODIFIED AND AFFIRMED.