***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence affirms the Opinion and Award of the Deputy Commissioner.
 *********** *Page 2 EXHIBITS
On the hearing dates, Defendant-Carrier St. Paul Fire and Marine Insurance Company submitted the following:
 a. A Search Request Form, which was admitted into the record, and marked as Defendant's Exhibit B1, and;
 b. An Affidavit of Mr. Brent Fowler, which was admitted into the record, and marked as Defendant's Exhibit B2.
Also at and subsequent to the hearing dates, Defendant-Employer Piedmont Products Company, Inc. submitted the following:
 a. A Packet of Piedmont Products Company's Financial Statements for the years 1969 to 1977, which is admitted into the record over the objection of defendant-carrier St. Paul Fire and Marine Insurance Company, and marked as Defendant's Exhibit A1;
 b. A Correspondence from Mr. Malcolm F. Mitchell to Piedmont Products company, Inc. dated 18 March 2005, which was admitted into the record, and marked as Defendant's Exhibit A2;
 c. An Insurance Summary for Piedmont Products Company, which was admitted into the record, and marked as Defendant's Exhibit A3;
 d. A Summary of Advantages and Disadvantages of Incorporating, which was admitted into the record, and marked as Defendant's Exhibit A4;
 e. A Packet of Documents Relating to the Winding Up of Piedmont Products Company as a Partnership, which was admitted into the record, and marked as Defendant's Exhibit A5; *Page 3 
 f. A Correspondence Relating to the Dissolution of Piedmont Products Company as a Partnership dated 14 June 1977, *Page 4 
which was admitted into the record, and marked as Defendant's Exhibit A6;
 g. The Final Tax Return for Piedmont Products Company as a Partnership, which was admitted into the record, and marked as Defendant's Exhibit A7;
 h. Tax Returns from 1975 and 1977 for Piedmont Products Company and Piedmont Products Company, Inc., which were admitted into the record, and collectively marked as Defendant's Exhibit A8;
 i. A Correspondence from Mr. Malcolm F. Mitchell Regarding Summarizing the Dissolution of Piedmont Products Company as a Partnership to Mr. Phillip Chapman dated 13 May 2005, which was admitted into the record, and marked as Defendant's Exhibit A9;
 j. A Handwritten Document Regarding the Liabilities of Piedmont Products Company as a Partnership, which was admitted into the record, and marked as Defendant's Exhibit A10;
 k. A Memorandum from Mr. Douglas A. Mitchell Regarding Piedmont Product Company's and Piedmont Products Company, Inc.'s Insurance Coverage dated 10 April 2005, which was admitted into the record, and marked as Defendant's Exhibit A11;
 l. A Packet of Correspondence Between Piedmont Products Company and the Charles E. Lambeth Insurance Agency for the years 1954 to 1972, which was admitted into the record, and marked as Defendant's Exhibit A12;
 m. A Packet of Financial Statements for Piedmont Products Company for the years 1958, 1960, 1961 and 1963, which was admitted into the record, and marked as Defendant's Exhibit A13;
 n. A Packet of Income and Expense Sheets for Piedmont Products Company for the years 1955 to 1968, which was admitted into the record, and marked as Defendant's Exhibit A13;
 o. A Packet of Documents Relating to Insurance Coverage for Piedmont Products Company and Piedmont Products Company, Inc. for the years of 1969 to 1980, which was admitted into the record, and marked as Defendant's Exhibit A15;
 p. The Articles of Incorporation for Piedmont Products Company, Inc., which was admitted into the record, and marked as Defendant's Exhibit A16;
 q. Minutes of a Meeting of Piedmont Products Company, Inc. from 5 January 1976, which was admitted into the record, and marked as Defendant's Exhibit A17;
 r. A Copy of a Check from Mr. P.P. McGarity, Jr. to the Charles Lambeth Insurance Agency dated 13 October 1961, which was admitted into the record, and marked as Defendant's Exhibit A18; *Page 5 
 s. The Deposition Transcript of Ms. Lillian McGarity Chapman, which is admitted into the record over Plaintiff's Objection, and marked as Defendant's Exhibit A19;
 t. A Correspondence from Counsel for Plaintiff's Office to Mr. Phillip Chapman dated 29 September 1999, which was admitted into the record, and marked as Defendant's Exhibit A20;
 u. A Page of Handwritten Notes by Mr. Phillip Chapman Regarding Communications with USF G, which was admitted into the record, and marked as Defendant's Exhibit A21;
 v. A Handwritten Correspondence from Mr. Phillip Chapman to Poyner Spruill Regarding USF G and its (Now St. Paul Fire Marine Insurance Company) dated 2 November 1999 which was admitted into the record, and marked as Defendant's Exhibit A22;
 w. The Deposition Transcript of Mr. Phillip Chapman which is admitted into the record over Plaintiff's Objection, and marked as Defendant's Exhibit A24 (Please Note: Defendant's Exhibit A23 was marked but not offered), and;
 x. A Prepared Timeline Regarding Piedmont Product Company and Piedmont Products Company, Inc. was marked as Defendant's Exhibit A25 but not admitted into the record with Defendant-Carrier's Objection having been sustained.
 *********** *Page 6 
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. This matter is before the Industrial Commission for a limited hearing relating to insurance coverage and the identity of the proper defendants in this action. It is stipulated that the Industrial Commission has jurisdiction of the subject matter involved in this dispute.
2. It is stipulated that Mr. Nathan Spencer Thomason, deceased employee, was employed from 1954 to 1963, by Piedmont Products Company, a partnership owned by Mr. Gene W. McGarity, now deceased, and Mr. Paul P. McGarity, Jr., now deceased.
3. Piedmont Products Company, Inc., denies that it was the employer of Nathan Spencer Thomason, deceased employee.
4. USF G denies that it provided workers' compensation coverage to Piedmont Products Company during the period of Nathan Spencer Thomason's employment.
5. All parties seek a determination from the Industrial Commission as to whether either of the defendants named above are proper parties to this action.
6. All parties further agree that all issues relating to the compensability of this claim, including but not limited, to any issues relating to the statute of limitations, average weekly wage, disability, or benefits owed, are reserved for a future hearing following the determination of the proper parties.
 ***********
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following: *Page 7 
 FINDINGS OF FACT
1. The now deceased-employee, hereinafter "Mr. Thomason," worked for Piedmont Products Company from 1954 until 1963, as a brick mason and insulator. In this capacity, his duties required him to insulate boilers at industrial facilities throughout North Carolina. In March 1998, Dr. Ahmed Elnaggar diagnosed Mr. Thomason as having asbestosis.
2. On 29 September 1999, Mr. Thomason filed an Industrial Commission Form 18B initiating this claim and served a copy by certified mail on Piedmont Products Company, Inc. The corporation forwarded the Form 18B to the presumed carrier, USF G (Now St. Paul Fire and Marine Insurance Company). On 17 July 2000, USF G's attorney filed an Industrial Commission Form 61 denying the compensability of the claim on behalf of both defendant-employer and defendant-carrier. The Form 61 further stated, "In addition, USF G has entered a limited appearance in this case until such time as it can confirm insurance coverage of Piedmont Products Company, Inc."
3. On 21 June 2002, Mr. Thomason filed an Industrial Commission Form 33 seeking determination as to the compensability of his claim. USF G, through its attorney, then filed an Industrial Commission Form 33R on behalf of both defendant-employer and defendant-carrier. The Form 33R alleged that insurance coverage was in dispute at that time. On 19 May 2003, Mr. Thomason died of sepsis secondary to pneumonia, and his Form 18B was amended to include the claim for death benefits on 21 October 2003. Thereafter, no litigation took place until 2005.
4. On 8 March 2005, M. Andrew Avram was retained by USF G to represent the interests of Piedmont Products Company pursuant to a reservation of rights. On 6 April 2005, the parties took the depositions of Mr. Phillip C. Chapman and Mrs. Lillian McGarity Chapman as part of the investigation on coverage issues. Following the depositions, USF G terminated *Page 8 
the services of Mr. Avram and he was allowed to withdraw. Piedmont Products Company, Inc. then retained a new attorney and filed an Industrial Commission Form 33 on 13 May 2005 requesting a hearing on the the following issues: whether the corporation is responsible for workers' compensation claims made against the partnership known as Piedmont Products Company, whether USF G provided workers' compensation coverage to the partnership, and whether USF G should be equitably estopped from denying coverage to the partnership.
 ISSUE I: WHETHER PIEDMONT PRODUCTS COMPANY, INC. IS RESPONSIBLE FOR CLAIMS AGAINST THE PARTNERSHIP KNOWN AS PIEDMONT PRODUCTS COMPANY.
5. Piedmont Products Company initially operated as a partnership, first involving Mr. Paul P. McGarity Sr. and his sons, and then as a partnership between those sons, Mr. Paul P. McGarity Jr. and Mr. Gene W. McGarity. Piedmont Products Company was located on North Tryon Street in Charlotte. As a partnership, the company was originally involved primarily in the business of boiler and refractory construction and repair, for which the partnership furnished skilled labor for extended periods of time.
6. In the early 1970s, both partners began to experience significant health problems. Mr. Paul McGarity, Jr. had emphysema and lupus, and eventually died in 1980. Mr. Gene McGarity had a variety of health problems and in 1977 suffered a stroke. Mr. Gene McGarity died in 1986. Along with these health problems involving the partners, the partnership also faced changes over time in its business, with jobs becoming less labor intensive and significantly shorter. Consequently, operating a refractory and boiler contracting business became increasingly difficult financially. Due to these changes, the partnership became more involved *Page 9 
over time in the sale of refractory materials and parts, primarily as a representative of the Detroit Stoker Company.
7. As the nature of Piedmont Products Company's business was changing, the partners decided to incorporate. On 31 December 1974, Articles of Incorporation were signed and adopted, creating the corporation Piedmont Products Company, Inc. During the winding up of the partnership, the assets were divided and distributed to the individual partners. Corporate minutes from 9 September 1977 establish that the assets received by the corporation came from individual partners in exchange for shares of corporate stock.
8. Income and Expense Sheets for the partnership and corporation establish that each was a separate legal entity that had some similarities in the nature of their business operations, reflecting the change over time involving the contracting and the sales side of the business. From 1969 to 1972, the vast majority of the partnership's income came from contract jobs, $329,457.92, while sales accounted for $36,308.87. In 1973 and 1974, the Income and Expense Sheets indicate that income from sales of materials began to increase, accounting for $68,303.94 in 1974. After its formation, the corporation continued to expand the sales business, which accounted for $128,467.36 in income during the first year of its operation in 1975. By 1977, after the dissolution of the partnership, income from sales was $158,010.04, while income from contracting jobs was $53,093.80.
9. After the formation of the corporation, Mr. Phillip C. Chapman, Mr. Gene McGarity's son-in-law, began working for the business. Once Mr. Gene McGarity suffered his stroke, Mr. Chapman began running the business, continuing the emphasis on sales while also operating the contracting side as long as it could break even. In 1995, following the retirement of employees who worked in the contracting side of the business, Mr. Chapman shut down *Page 10 
contracting operations and moved the business to smaller offices, since the larger office and warehouse at the North Tryon Street location were no longer needed.
10. Although the owners of the partnership were the initial stockholders of the corporation and there is evidence of a similarity in business between these two entities, under the "mere continuation" test adopted in this State, as opposed to the "substantial continuity" test, there is insufficient evidence of record upon which to find that Piedmont Products Company, Inc. is liable for the debts of the partnership known as Piedmont Products Company.
11. Because an employee-employer relationship never existed between Mr. Thomason and Piedmont Products Company, Inc., and said corporation did not assume any liabilities of Piedmont Products Company, the partnership, plaintiff could not receive workers' compensation benefits from Piedmont Products Company, Inc. Consequently, the claim against Piedmont Products Company, Inc. should be dismissed.
 ISSUE II: WHETHER USF G (NOW ST. PAUL FIRE AND MARINE INSURANCE COMPANY) PROVIDED WORKERS' COMPENSATION INSURANCE COVERAGE TO PIEDMONT PRODUCTS COMPANY AS A PARTNERSHIP DURING THE PERIOD OFPLAINTIFF'S EMPLOYMENT.
12. Until 1995, all records relating to the operation of Piedmont Products Company and Piedmont Products Company, Inc. were kept at the North Tryon Street location. Following the move to smaller offices, there was insufficient space to retain all records. Accordingly, after consulting with its accountant, the corporation destroyed all records more than ten (10) years old.
13. Mrs. Lillian McGarity Chapman began working for Piedmont Products Company, Inc. in 1979, as the bookkeeper. In this capacity, Mrs. Chapman was the custodian of records and financial documents, including workers' compensation insurance policies. Mrs. Chapman *Page 11 
testified that after beginning her job with the corporation, she observed drawers full of old workers' compensation insurance policies all issued by USF G. She also observed approximately half of a drawer of old USF G workers' compensation claims. Mrs. Chapman testified that up until the time she began her employment, no partnership documents had ever been discarded. She observed no older policies, going back into the 1950s, issued by any company other than USF G. Her Husband, Mr. Phillip Chapman, confirmed in his testimony that all of the older workers' compensation insurance policies he had seen were issued by USF G.
14. Mr. Malcolm F. Mitchell of Charlotte has been the accountant for Piedmont Products and subsequently, Piedmont Products Company, Inc. since the late 1960s, when he assumed this responsibility and received the books from the previous accountant. Mr. Mitchell continued the preparation of Income and Expense Sheets as the previous accountant had done. Each of the Income and Expense Sheets for the years 1955 through 1977, contain a line item for insurance. Mr. Mitchell testified that the insurance line item included all insurance costs, including costs of workers' compensation insurance, and that it remained relatively stable for the period 1955-1977. To Mr. Mitchell, this insurance line item consistency suggested that the partnership and corporation had workers' compensation coverage throughout that period because there would have been a significant increase in insurance costs followed by years where the costs remained at that level had the partnership acquired workers' compensation insurance along the way.
15. Mr. Walter Lambeth was the partnership's and the McGarity family's personal insurance agent. Mrs. Chapman testified that for as long as she could remember, Mr. Lambeth handled all of her father's insurance needs. Mr. Lambeth died in 1983. *Page 12 
16. Mr. Doug Mitchell, Mr. Lambeth's son-in-law, began working for the Lambeth Insurance Agency in the early 1970s and assisted with the accounts for Piedmont Products as a partnership and then later as a corporation. Mr. Doug Mitchell testified that Mr. Gene McGarity and Mr. Paul McGarity, Jr. relied on the agency to determine the types of insurance that the partnership needed and to obtain the best carriers and rates. Therefore, the Lambeth Agency always procured workers' compensation insurance for the partnership and would have been negligent had it failed to do so. As for defendant-carrier, Mr. Mitchell testified that while he worked for the agency, it maintained a practice begun before his arrival of matching Piedmont Products Company with USF G for all insurance needs. As for possible changes in workers' compensation insurance carriers, Mr. Doug Mitchell testified that the agency had a practice of bundling different types of policies from one carrier in order to obtain better rates for its customers. To also obtain better rates and service, it was not a common practice to move accounts around from carrier to carrier, but to maintain consistency in coverage from year to year. Additionally, correspondence on USF G letterhead from Mr. Walter Lambeth to Mr. Gene McGarity and Mr. Paul McGarity dated 2 May 1961, contains a notation stating, "USF G representative for more than fifteen years." Coupled with Mr. Doug Mitchell's testimony, this correspondence demonstrates that the relationship between the Lambeth Agency and USF G extended more than thirty (30) years.
17. Mrs. Lillian McGarity Chapman agreed that the business insurance policies, including liability, vehicle insurance, workers' compensation, and any other policies were sent to Piedmont Products Company in a "bundle" from the Lambeth Insurance Agency.
18. The partnership's 1977 Income and Expense sheet showed an additional workers' compensation payment as a result of the carrier's audit. The logical inference from the *Page 13 
characterization of the expense as an additional payment is that the partnership already had and had paid for workers' compensation coverage, and was being assessed an additional charge. Furthermore, there would be no audit by any carrier unless the partnership had workers' compensation insurance prior to 1977.
19. Similarly, Mr. Mitchell's handwritten summary regarding the advantages and disadvantages of incorporating, which was prepared in the early 1970s, includes the fact that the partners would be eligible for the workers' compensation benefits under the corporate format, but would not be if the business remained a partnership. Again, there would be no reason to include this as an advantage unless the partnership already had workers' compensation insurance for its employees.
20. Industrial Commission records indicate that Piedmont Products Company as a partnership and Piedmont Products Company, Inc. were insured by USF G for worker's compensation purposes from 1969, when the Commission began the retention of such information, until at least 1980.
21. Mr. Charles Brent Fowler testified for defendant-carrier. Mr. Fowler leads a litigation support group as a Records Management Consultant and performs searches for policies as part of his duties. Mr. Fowler conducted a multi-parameter search for USF G workers' compensation insurance policies for Piedmont Products Company for the period of 1955 to 1963. Based upon this search, Mr. Fowler testifed that St. Paul Fire and Marine Insurance Company had no such policy issued by USF G in its databases, files or records. However, Mr. Fowler could not verify that St. Paul Fire and Marine Insurance Company had in its possession each and every workers' compensation insurance policy issued by USF G for the years in question. This would be true given USF G's business habit during the years 1955 to 1963, of destroying *Page 14 
policies on which no claims had been filed after a period of three years. In fact, Mr. Fowler testified that it was completely possible for workers' compensation insurance policies for Piedmont Products Company for these years to have been purged by USF G. Additionally, Mr. Fowler also conceded certain limitations existed with respect to the documents available for his review. For example, he agreed that the period in question was before the era of computers, which made document retention for companies like USF G, which dealt with extensive amounts of paper, cumbersome and problematic.
22. In addition to policy retention issues, the Full Commission finds that a search on the scale undertaken by Mr. Fowler would likely contain a significant degree of unreliability. This is in part due to the sheer volume of documents involved, with 4.2 million documents being added to St Paul Travelers by April 2000, as a result of the merger between Travelers and St Paul Fire and Marine in 1998. The total claim files contained in the archives reached 9.9 million. The manual claim log review took 4 days to complete and included thousands of claims filed between 1953 and 1964. Additionally, USF G went through two major mergers since the 1955-1963 time period, first with St. Paul and later with The Travelers. As a result of the mergers, policies and departmental responsibilities affecting what documents were retained, stored, and ultimately entered in the computer database searched by Mr. Fowler likely would have changed over the years. Since even the most complete and accurate record searches are only as good as the material stored or entered in the system, any mistakes or oversight in data entry before the acquisition of USF G would affect the outcome of the search of St. Paul's records.
23. Mr. Glenn Wilson Sr. worked at Piedmont Products Company during the period of Mr. Thomason's employment. Mr. Glen Wilson was approximately seventy (70) years old at the time of his deposition and had difficulty recalling specific dates, but testified that Piedmont *Page 15 
Products Company had good insurance coverage and that he did not know of any claims or injuries to co-workers that were not paid by insurance.
24. Although in some situations, the absence of direct evidence on an issue would raise an inference suggesting that the evidence or information did not exist. In this case, however, given the extended time between the employment and onset of the alleged occupational disease, along with the factors outlined in the above findings, no such inference can reasonably be drawn from the evidence. Thus, the fact that no policy survives to be produced and examined neither resolves the issue nor creates any presumption either for or against the existence of coverage or the identity of the carrier. Considering the challenges involved in presenting evidence of coverage without policy records or surviving witnesses, the inferences supporting the contention that USF G was the workers' compensation carrier for the partnership from 1955-1963, are convincingly strong. In fact, there is sufficient credible evidence of record upon which to find that Piedmont Products Company maintained workers' compensation insurance with USF G during the period 1955-1963.
 ISSUE III: WHETHER USF G (NOW ST. PAUL FIRE AND MARINE INSURANCE COMPANY) IS ESTOPPED FROM DENYING COVERAGE TO PIEDMONT PRODUCTS COMPANY AS A PARTNERSHIP.
25. On or about 29 September 1999, Mr. Chapman received a certified letter from the firm of Wallace Graham advising him and Piedmont Products Company, Inc. of Mr. Thomason's claim relating to exposure to asbestos while employed by Piedmont Products Company, the partnership. Mr. Chapman promptly forwarded this letter to USF G for defense because he was not aware of any other company ever providing workers' compensation insurance to the partnership. Then, on or about 1 November 1999, Mr. Chapman had a telephone *Page 16 
conversation with a Ms. Jennifer Lowe, an adjuster with USF G, who advised him that USF G had not been able to confirm coverage, but would provide a defense "regardless of the outcome of the search [for coverage]." Mr. Chapman's testimony concerning his telephone conversation with Ms. Jennifer Lowe is found to be credible.
26. USF G, through its attorney, filed NCIC Forms 61 and 33R on behalf of defendant-employer and defendant-carrier. These forms reference difficulty in confirming coverage. There is no evidence indicating that either form was ever provided to Mr. Chapman. Other than these references in forms, USF G took no formal steps with respect to its coverage defenses, with no motions being filed, no discovery undertaken and no request for further documentation from Piedmont Products Company, Inc. USF G never advised Mr. Chapman of a potential conflict between the carrier and Piedmont Products Company or Piedmont Products Company, Inc., as a result of the coverage dispute.
27. After the filing of Mr. Thomason's claim, two more claims were filed by Wallace Graham on behalf of former employees of the partnership. The claim of Mr. Glenn Wilson, Sr. was filed in 2000, and the claim of Mr. Jesse Wilson was filed in 2002. Mr. Chapman forwarded both claims to USF G for handling, and the carrier resolved both.
28. In February 2005, nearly five and one-half years after his conversation with Ms. Lowe regarding the claim at hand, Mr. Chapman learned for the first time that USF G was denying coverage and not providing a defense to defendant-employer in this claim.
29. Due to USF G's failure to retract the statement by Ms. Lowe regarding the providing of a defense for over five (5) years, and Mr. Chapman's reasonable reliance on that statement, Piedmont Products Company was materially prejudiced to its detriment. This is true given the lost opportunity to depose Mr. Thomason (the deceased employee), who died in 2003, *Page 17 
and Mrs. Ann McGarity, Mr. Gene McGarity's wife, who worked as the bookkeeper in the 1960s, and 1970s, but became ill with Alzheimer's in 2002. Mrs. Ann McGarity would have had personal knowledge of vital information relating to insurance coverage during the relevant time period because she was the partnership's bookkeeper beginning in the late 1960s, and would have seen or reviewed coverage records for the preceding five to ten (5-10) years in the course of her job duties. Further, she was married to one of the partners in a small family business, a relationship that would provide access to many details relating to the operation of the business. Given these circumstances, USF G (now St. Paul Fire and Marine Insurance Company) should be equitably estopped from denying coverage for Mr. Thomason's claim.
30. This claim was filed in September 1999. A copy of the Form 18B was forwarded to USF G by Mr. Thomason and/or his legal counsel and by Piedmont Products' Company, Inc. On 17 July 2000, USF G's attorney filed an Industrial Commission Form 61 denying the compensability of the claim on behalf of both the employer and carrier. This denial was filed nearly a year after the claim was filed.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. Mr. Nathan Spencer Thomason, deceased employee, was employed by Piedmont Products Company, the partnership from 1954 to 1963. Because an employee-employer relationship never existed between Mr. Thomason and Piedmont Products Company, Inc., and said corporation did not assume any liabilities of Piedmont Products Company, a partnership, plaintiff could not receive workers' compensation benefits from Piedmont Products Company, *Page 18 
Inc., and that party should be dismissed from this matter. N.C. Gen. Stat. § 97-2; See Pendergrass v. Card Care, Inc., 333 N.C. 233, 240
(1993) ("If all the assets of a corporation are transferred, a claim against the transferring corporation might be worthless. When a partnership transfers its assets, the partners remain liable. We do not believe this is a case in which the mere continuation rule should apply.").
2. Based upon the credible evidence of record and the reasonable inferences there from, the Full Commission concludes as a matter of law that Piedmont Products Company maintained workers' compensation insurance with USF G during the period 1955 to 1963.
3. Given Mr. Chapman's reasonable reliance on statements regarding the providing of coverage by representatives of USF G to the detriment of Piedmont Products Company, USF G (now St. Paul Fire and Marine Insurance Company) should be equitably estopped from denying coverage for Mr. Thomason's claim. See e.g. Whitacre Partnership v. Biosignia,Inc., 358 N.C. 1, 591 S.E.2d 870 (2004).
4. Due to defendant-carrier's failure to timely file proper forms as required by the Act and Workers' Compensation Rules, USF G is subject to a reasonable sanction in the amount of $200.00 to be paid to the Industrial Commission. N.C. Gen. Stat. § 97-18; Workers' Compensation Rules 802 and 601.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Piedmont Products Company, Inc. is hereby DISMISSED from any further proceedings with respect to this claim. *Page 19 
2. Because USF G provided workers' compensation coverage to the partnership known as Piedmont Products Company for the period of 1955 to 1963, USF G (Now St. Paul Fire and Marine Insurance Company) is therefore responsible for the defense of this claim.
3. USF G is precluded by the doctrine of equitable estoppel from denying coverage to Piedmont Products Company, the partnership.
4. For violating the Act and Workers' Compensation Rules, defendant USF G shall pay a sanction in the amount of $200.00 to be paid by check payable to the North Carolina Industrial Commission and forwarded to Ms. Carolyn Wall, Accounts Receivable, at the Industrial Commission address.
5. Defendant USF G (St. Paul Fire and Marine Insurance Company) shall pay the costs.
This the ___ day of April 2007.
 S/ _____________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/ _____________ DIANNE C. SELLERS COMMISSIONER
 S/ _____________ PAMELA T. YOUNG COMMISSIONER *Page 1