UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 09-1768

ALLEN TOBY HEDGEPETH, As Trustee Under The Allen Toby
Hedgepeth Declaration of Trust, Dated May 30, 2001,

Plaintiff - Appellant,

v.

PARKER'S LANDING PROPERTY OWNERS ASSOCIATION, INCORPORATED,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern
District of North Carolina, at Wilmington.  James C. Fox, Senior
District Judge.  (2:07-cv-00055-F)

Argued:  May 12, 2010                    Decided:  July 2, 2010

Before GREGORY, Circuit Judge, C. Arlen BEAM, Senior Circuit
Judge of the United States Court of Appeals for the Eighth
Circuit, sitting by designation, and Samuel G. WILSON, United
States District Judge for the Western District of Virginia,
sitting by designation.

Affirmed by unpublished opinion.  Judge Wilson wrote the
opinion, in which Judge Gregory and Senior Judge Beam joined.

**ARGUED:** Norman Wilson Shearin, Jr., VANDEVENTER BLACK, LLP,
Kitty Hawk, North Carolina, for Appellant.  Charles E. Thompson,
II, Elizabeth City, North Carolina, for Appellee.  **ON BRIEF:**
Allison A. Holmes, VANDEVENTER BLACK, LLP, Raleigh, North
Carolina, for Appellant.

Unpublished opinions are not binding precedent in this circuit.

WILSON, District Judge:

Plaintiff-appellant, Allen Toby Hedgepeth ("Hedgepeth"), brought an action pursuant to the district court's diversity jurisdiction against Parker's Landing Property Owners Association, Inc. (the "Association"), defendant-appellee, seeking a declaratory judgment that he has an easement over an established drive owned by the Association benefiting an adjoining tract of land he purchased at a foreclosure sale. Alternatively, Hedgepeth sought a judgment declaring that quasi-estoppel precludes the Association from denying the existence of that easement. The district court entered a declaratory judgment recognizing two historical easements but not the easement Hedgepeth claimed and Hedgepeth appealed. We affirm.

I.

In 1894, a tract of land in Currituck County, North Carolina, was severed from common ownership into two tracts. The smaller of the two tracts – the "Harbor Shore Tract" – is bordered on the east by the Currituck Sound. The only access to the Harbor Shore Tract is through the larger tract – Parker's Landing Subdivision ("Parker's Landing") – which borders the Harbor Shore Tract on the west and south. U.S. Highway 158, the primary means of travel in the area, makes up the western border

3

of Parker's Landing.  Both Harbor Shore and Parker's Landing were used for agricultural purposes until the late 1980s when steps were taken to develop them for residential use.  Before this development, access to the Harbor Shore Tract was available via two historical easements that cross Parker's Landing.[1]

In 1987, two brothers, Donnie and Lannie Belangia, along with their wives (the "Belangias"), purchased the Harbor Shore Tract intending to develop it into a residential subdivision called Harbor Shore.  At that time, Midgette Development Enterprises, Inc. ("MDE"), which was owned by members of the Midgette family, owned Parker's Landing.  The Belangias approached the Midgettes to assess their interest in jointly developing the tracts.  Both the Belangias and the Midgettes hired William T. Robbins ("Robbins"), a surveyor, to prepare plats of their respective properties and to obtain county approval for their proposed subdivisions.[2]  Robbins succeeded in obtaining preliminary plat approval for both tracts from the Currituck County Board of Commissioners (the "Board of Commissioners").  The Currituck County Planning Board (the

---

[1]  These easements, one of which provides ten foot access, the other twenty-five, are dirt paths that cross over Parker's Landing onto the Harbor Shore Tract.

[2]  The Belangias and the Midgettes hired Robbins independently and later learned that he was working on both of their proposed subdivisions.  (J.A. 203.)

4

"Planning Board"), however, only granted approval of Parker's Landing's final plat because Harbor Shore lacked the fifty foot access required for development.

After the Planning Board denied approval of Harbor Shore's final plat, the Belangias continued negotiating with the Midgettes in an effort to reach an agreement for an easement over Parker's Landing's main road, Parker's Landing Drive (the "Drive"). Despite extensive negotiations and the exchange of various proposed agreements, those negotiations, according to the deposition testimony of the Midgettes and the Belangias, ultimately failed to result in an executed agreement. Jody Midgette, MDE's Vice President, testified that negotiations had never produced an agreement, that "there was nothing . . . final ever done" (J.A. 160); Lannie Belangia responded "no" to the question of whether they had ever come to an agreement for access (J.A. 202); and when asked whether negotiations had ever resulted in written agreements, Donnie Belangia testified: "I think there [were] some prepared. But none were ever signed." (J.A. 216-17.) Left without the access necessary for development, the Belangias permitted Harbor Shore to enter foreclosure.

Before purchasing the property at foreclosure in January of 1993, Hedgepeth claims he: inspected the property (which he accessed via one of the historical easements); checked records

5

at the county tax office and courthouse; reviewed statements contained in minutes of the Board of Commissioners' meeting of October 17, 1988, (the "Board Minutes"), which state that "approval of a permanent easement through Parker's Landing to [Harbor Shore] has been proposed and has been signed for the County Attorney to review"; and examined the 1989 Final Plat of Parker's Landing (the "Final Plat"), which contains a note, Note #7, which cryptically states: "additional area required for 50' R/W as per agreement with Harbor Shore Subdivision." Hedgepeth, however, neither conducted a title search, nor contacted either the Belangias or the Midgettes to inquire about access to the property. Only after he purchased the property at the foreclosure sale[3] did he contact the County Attorney's office to search for the agreement that he claims he inferred from the cryptic note on the Final Plat. No one at the County Attorney's office knew of the alleged agreement.

After purchasing the Harbor Shore Tract at the foreclosure sale, Hedgepeth sent employees to view the property, which they accessed via the Drive. The Midgettes warned Hedgepeth's employees that they had no right to use the Drive, and if they did not vacate the premises, the Midgettes would have them

---

[3] He assigned his bid to the Hedgepeth Development Corporation ("HDC"), and he later became trustee for the property on HDC's behalf pursuant to a declaration of trust.

6

arrested. Fourteen years after purchasing the Harbor Shore Tract, Hedgepeth filed this diversity action against the Association – the successor in title to MDE to Parker's Landing's "common areas," including the Drive[4] – seeking a judgment declaring that Parker's Landing is subject to an easement benefiting the Harbor Shore Tract via the Drive and declaring that quasi-estoppel precludes the Association from denying the existence of that easement.

Hedgepeth moved for summary judgment. The district court denied the motion, but nevertheless concluded that there were no issues of material fact for trial and proceeded to rule that the evidence supported neither the easement Hedgepeth claimed nor the elements of his quasi-estoppel claim. Although the district court rejected Hedgepeth's claims, it concluded that Parker's Landing is subject to two historical easements benefiting the Harbor Shore Tract. Accordingly, it entered a judgment declaring Hedgepeth's rights as to those historical easements but not the easement Hedgepeth claimed.[5] Hedgepeth filed this

---

[4] In 2005, the Association became the owner of the "common areas" of Parker's Landing, while MDE and the Midgettes retained plots within the subdivision.

[5] The district court said the following about the procedural posture of the case:

> In light of the awkwardness of the standard of review applicable to a plaintiff's motion for summary

(Continued)

appeal.  Neither party raises the case's procedural posture as an issue on appeal.[6]  Rather, Hedgepeth frames the issue simply as: "Was Hedgepeth conveyed a right-of-way over [the] Drive from [the Harbor Shore Tract] to U.S. Highway 158 by the final plat of Parker's Landing subdivision?"  (Appellant's Brief at 1.)

## II.

Hedgepeth's opening brief contends that "Note # 7 on the final plat of the [Parker's Landing] Subdivision is an express grant of a right-of-way over the Drive to the [Harbor Shore] Tract."  (Appellant's Brief at 8.)  At oral argument, however,

---

> judgment in a case to be tried to the court without a jury, the court has taken some license in its approach.  Regardless of the angle from which this case is viewed, or with which party a shifting-burden inquiry begins, Hedgepeth, who ultimately must prove he is entitled to judgment as a matter of law, unequivocally has demonstrated that he cannot do so insofar as he seeks declaration of an easement for use of Parker's Landing Drive to subdivide and develop [the Harbor Shore Tract].

(J.A. 454-55.)

[6]  Because the denial of Hedgepeth's motion for summary judgment is interlocutory, and we have jurisdiction only over final orders and judgments, we questioned our jurisdiction *sua sponte*.  We now conclude, however, that because the judgment order appealed from had the effect of resolving all issues, it is a final order.  See Caitlin v. United States, 324 U.S. 229, 233 (1945) ("A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.").

Hedgepeth conceded that the Final Plat standing alone could not create an easement and that "you've got to go somewhere else" – i.e. to the underlying agreement – "to get the full story." Thus, it seems to us that Hedgepeth has conceded the first issue and has raised another issue in its stead. We think this concession effectively ends the analysis because arguments not raised in a party's opening brief ordinarily are waived. See United States v. Bowles, 602 F.3d 581 (4th Cir. 2010); Equal Rights Ctr. v. Niles Bolton Assocs., 602 F.3d 597 (4th Cir. 2010). Nevertheless, we consider the issue that Hedgepeth raised at oral argument.

Though his arguments lack some clarity, Hedgepeth appears to argue that the Midgettes and the Belangias reached an agreement for an easement, which the Final Plat reflects. According to Hedgepeth, the Final Plat satisfies the statute of frauds. We assume arguendo, though in no way decide, that a final plat can constitute a writing that satisfies the statute of frauds. We still agree with the district court, however, that the evidence cannot support the conclusion Hedgepeth would have us reach – that the negotiating parties ever consummated an agreement for an easement. Indeed, the unequivocal testimony of record of the parties whom Hedgepeth contends reached an agreement proves nothing was ever finalized.

9

We look to North Carolina law to determine what is necessary for the creation of an express easement. Because an easement is an interest in land (and thus subject to North Carolina's statute of frauds) words of intent to create an easement must be memorialized and signed by the party to be charged. See N.C. GEN STAT. § 22-2; Singleton v. Haywood Elec. Membership Corp., 565 S.E.2d 234, 238 (N.C. App. 2002). Although "[n]o particular words are necessary" to create an express easement, Z.A. Sneeden's Sons, Inc. v. ZP No. 116, L.L.C., 660 S.E.2d 204, 209 (N.C. App. 2008) (quoting Hensley v. Ramsey, 199 S.E.2d 1, 10 (N.C. 1973)), and "any words which clearly show the intention to give an easement . . . are sufficient to effect that purpose, provided the language is certain and definite in its terms . . ., [t]he instrument should describe with reasonable certainty the easement created and the dominant and servient tenements." Id. Whatever the language used, the parties must intend to create an easement in order for an express easement to arise. Thus, if the parties intend that an easement arise only upon the execution of a contract (with the exchange of consideration and the required meeting of the minds), no easement arises until the contract is executed.

Here, Hedgepeth's argument that the Final Plat is some reflection of an underlying agreement for an easement can only take him so far because the Final Plat does not "clearly show

10

the intention to give an easement." Z.A. Sneeden's Sons, Inc., 660 S.E.2d at 209. If anything, it merely provides notice that it is necessary to look elsewhere for an agreement. Hedgepeth conceded as much at oral argument when he admitted it is necessary to look beyond the Final Plat to find an agreement creating an easement over the Drive.

Of course, in light of the deposition testimony of the negotiating parties, a search for that agreement proved fruitless because the parties never finalized their negotiations[7] and thus, no easement ever arose.[8] There is simply no evidence that all of the required parties ever had a meeting of the minds as to all of the terms, which is required to form a binding contract.[9] See Normile v. Miller, 326 S.E.2d 11, 15 (N.C. 1985)

_____

[7] The Court notes that Hedgepeth's counsel acknowledged as much at oral argument when he stated that "what was going on here . . . was that the developer kept getting up time and time again raising the consideration that was going to be paid."

[8] No easement arose because the negotiating parties, as indicated by their depositions and their actions, intended that no easement would be granted until they had executed a contract conveying the easement in exchange for an agreed upon consideration. No consideration was ever agreed upon and thus, no easement was created.

[9] There is evidence that a draft of the proposed agreement was signed by the Midgettes and Lannie Belangia and his wife but not by Donnie and his wife. The district court took note that an affidavit submitted by Lannie, when compared with his earlier deposition testimony, raises some question as to whom the affidavit refers when it states that "a copy of the agreement for access . . . was signed by us . . . ." In light of the (Continued)

11

("It is axiomatic that a valid contract . . . can only exist when the parties assent to the same thing in the same sense, and their minds meet as to all terms.") (citations omitted). We think the conduct of the parties to the supposed agreement speaks volumes on this point. Unable to secure an agreement, the Belangias abandoned their venture and permitted their property to enter foreclosure. Yet, nearly fifteen years after the parties believed their negotiations had failed to bear fruit, Hedgepeth, the purchaser at foreclosure and a stranger with no firsthand knowledge of the parties' negotiations, essentially claims that the negotiating parties were simply wrong to believe that they had not entered into a binding contract. Under the circumstances, Hedgepeth's claim seems especially untenable.

Undaunted, Hedgepeth points to another secondary source – the October 17, 1988, Board Minutes – which ambiguously reference an easement through Parker's Landing to Harbor Shore. The Planning Board, however, ultimately denied approval of Harbor Shore's final plat because Harbor Shore lacked the required access. Against this backdrop (and the deposition

---

testimony of the Midgettes and Donnie Belangia that no agreement between all the parties was ever reached, the "us" Lannie refers to includes himself and his wife, not his brother or his brother's wife.

12

testimony of the parties to the alleged agreement), it is hard to find any significant probative value in the Board Minutes.

In sum, we find no fault in the district court's determination that the Midgettes and the Belangias never reached an understanding for the creation of an easement.

## III.

Hedgepeth contends that because the Association's predecessor in title obtained approval of its final plat by representing to the Planning Board that it had given the proposed Harbor Shore development a right-of-way over the Drive, quasi-estoppel precludes the Association from taking the position that there is no easement over the Drive.[10] The Association counters that there are no facts to support this claim. We agree and affirm on this ground.

Quasi-estoppel, or estoppel by benefit, see Carolina Medicorp., Inc. v. Bd. of Trustees of State of N.C. Teachers' and State Employees' Comprehensive Major Med. Plan, 456 S.E.2d 116, 120 (N.C. App. 1995), provides that when a party takes and retains benefits under a transaction or instrument, which it has

---

[10] It is Hedgepeth's position that because the Association is in privity with MDE and the Midgettes, then to the extent they would be estopped, the Association is estopped. See Whitacre P'ship v. Biosignia, Inc., 591 S.E.2d 870, 893 (N.C. 2004).

the right to accept or reject, that party's retention of the benefits acts to ratify the transaction or instrument such that the party cannot avoid its obligation or effect under the transaction or instrument by later taking a position inconsistent with the transaction or instrument, see Parkersmith Properties v. Johnson, 525 S.E.2d 491, 495 (N.C. App. 2000).

We find the record devoid of any support for Hedgepeth's claim. First, although there is evidence that the Midgettes represented that they were working with the Belangias to reach an agreement, there is no evidence that they represented to either the Board of Commissioners or the Planning Board that the negotiating parties had in fact reached an agreement for access. At best, Hedgepeth's claim seems strained, given that the Planning Board granted approval of Parker's Landing's final plat, but not Harbor Shore's final plat because Harbor Shore had not secured the fifty foot access necessary for development. Second, Hedgepeth is hard-pressed to identify any benefit the Association received. Therefore, we agree with the Association that there are no facts to support this claim.

IV.

For the reasons stated, the judgment of the district court is affirmed.

AFFIRMED

14